**LABATON SUCHAROW LLP**
Carol C. Villegas
David J. Schwartz
Jake Bissell-Linsk
David Saldamando
140 Broadway
New York, New York 10005
Phone: (212) 907-0700
cvillegas@labaton.com
dschwartz@labaton.com
jbissell-linsk@labaton.com
dsaldamando@labaton.com

*Counsel for Lead Plaintiff LB Motion Ltd.*
*and additional named Plaintiff Aric Rav Tilman*
*and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall
Rina Restaino
1880 Century Park East, Suite 404
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com
rina@schallfirm.com

*Additional Counsel for Lead Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IDAN BAR-ASHER, individually and on behalf of all others similarly situated,<br><br>                        Plaintiff,<br><br>   v.<br><br>PLAYTIKA HOLDING CORP., ROBERT ANTOKOL, CRAIG J. ABRAHAMS, TROY J. VANKE, WEI LIU, MARC BEILINSON, BING YUAN, TIAN LIN, MORGAN STANLEY & CO. LLC, CREDIT SUISSE SECURITIES (USA) LLC, CITIGROUP GLOBAL MARKETS INC., GOLDMAN SACHS & CO. LLC, UBS SECURITIES LLC, BOFA SECURITIES INC., ROBERT W. BAIRD & CO. INCORPORATED, COWEN AND COMPANY LLC, STIFEL, NICOLAUS & COMPANY INCORPORATED, WEDBUSH SECURITIES INC.<br><br>                        Defendants. | **Case No. 1:21-cv-06571-RPK-SJB**<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 2

II.   JURISDICTION AND VENUE ......................................................................... 6

III.  PARTIES AND WITNESSES............................................................................ 7

      A.   Plaintiffs ................................................................................................7

      B.   Defendants .............................................................................................7

           1.   Corporate Defendant ................................................................. 7

           2.   Individual Defendants ............................................................... 8

           3.   Underwriter Defendants ............................................................ 9

      C.   Confidential Witnesses ........................................................................12

IV.   SUBSTANTIVE ALLEGATIONS ................................................................. 12

      A.   Playtika's January 15, 2021 IPO ........................................................12

      B.   Playtika's Entire Business Model Was Based Off an Extreme Hyper-Focus on a Tiny Subset of Paying Customers ......................................19

      C.   Playtika's Revenues Depend on a "Constant Cadence" of Product Features and Content ............................................................................24

      D.   *Slotomania* and *Bingo Blitz* Are Playtika's Most Important and Profitable Games By Far, Accounting for Half of the Company's Total Revenues ............30

      E.   The Company Had Plans in Place—Prior to the IPO—to Materially Change the Infrastructure of Each Game, Which Were Not Disclosed................36

           1.   *Slotomania* – A Complete Migration From C-Sharp to JavaScript .......... 37

                a.   The *Slotomania* Migration Placed at Risk the Ability to Generate and Timely Rollout Features and Content.................... 38

           2.   *Bingo Blitz* – A "Complete Brand Face Lift" and "Total Revamping" of the User Interface Because the Game was "Outdated" ................................................ 46

                a.   The *Bingo Blitz* User Interface Projects Placed at Risk the Ability to Generate and Timely Rollout Features and Content......................................................... 49

F.     Defendants' Materially False and Misleading Statements and Omissions ............53

      1.     Statements Concerning Playtika's "Constant Cadence" of Product "Features" ......................................................................... 54

      2.     The Registration Statement Failed to Disclose and Misrepresented Significant Risks ............................................................. 63

G.     Events Following the IPO ............................................................66

V.     CLASS ACTION ALLEGATIONS ......................................................... 70

VI.     CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ........................................... 72

COUNT I: Violation of Section 11 of the Securities Act Against Defendant Playtika, the Individual Defendants, and the Underwriter Defendants ................72

COUNT II: Violation of Section 15 of the Securities Act Against the Individual Defendants ........................................................................75

VII.     PRAYER FOR RELIEF ................................................................. 76

VIII.     JURY DEMAND .......................................................................... 76

Lead Plaintiff LBMotion Ltd. and additional named Plaintiff Aric Rav Tilman (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, bring this amended complaint (the "Complaint") for violations of the federal securities laws against Playtika Holding Corp. ("Playtika" or "Company"), Robert Antokol, Craig Abrahams, Troy J. Vanke, Wei Liu, Marc Beilinson, Bing Yuan, Tian Lin, and the Underwriter Defendants, defined below[1] (collectively, the "Defendants").

Plaintiffs allege the following upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included: (a) a review of public filings made with the Securities and Exchange Commission ("SEC"); (b) a review of press releases, analyst reports, news articles, and other publicly available information; (c) a review of interviews and other public statements made by Playtika and other Defendants; (d) interviews with former Playtika employees; and (e) consultation with a software systems expert and a damages expert.  Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein that will be revealed through continued investigation and discovery.

Congress passed the Securities Act of 1933 ("Securities Act") in the hopes of restoring investor confidence after corporate scandals and the stock market crash of 1929.  The Securities Act requires that those who sell securities to the investing public do so on the basis of accurate and fulsome disclosures.  In order to protect investors and maintain confidence in our public markets, the Securities Act creates liability for false and misleading statements made in connection with public securities offerings.

---

[1] *Infra* ¶¶34-44.

The claims asserted herein allege that Defendants negligently issued false and misleading statements in violation of the Securities Act, in connection with Playtika's initial public offering ("IPO" or the "Offering") of 79,925,000 shares of common stock at a price of $27.00, which occurred on January 15, 2021.

As more fully stated herein, this securities action is brought on behalf of a class of all persons or entities who purchased or otherwise acquired Playtika common stock pursuant and/or traceable to the Company's Registration Statement, as defined herein, and who were damaged thereby ("Class").

I.     INTRODUCTION

1.      Playtika is a technology company that develops free-to-play mobile games. Playtika's games, such as its modern take on slots, bingo, and poker, are classified as "social casino" or "social casual" games.

2.      While Playtika's games retain elements of traditional casino games, users do not actually gamble with real-world currency.  Instead, Playtika's revenues were, and continue to be, almost entirely dependent on users making in-game[2] purchases of virtual items.  These transactions accounted for 97-98% of Playtika's revenues, with the remaining revenue coming from advertisements or other sources.  Yet, a tiny minority (just 2-3%) of Playtika's users actually made these in-game purchases, and the rest played the games for free.

3.      In January 2021, the Company was set to launch its IPO and enter the public markets.  As part of the IPO, an insider who owned more than 96% of the Company was positioned to sell off a large portion of their shares.  Of the $2.16 billion that was to be raised from the public in the IPO, the selling insider was set to receive a whopping ***$1.66 billion*** (77%

---

[2] "In-game" is referred to herein throughout this Complaint synonymously with "in-app," and vice-versa.

of funds raised).  In contrast, Playtika itself would only receive $500 million in new capital (23% of funds raised), a comparatively modest sum, especially given that Playtika was – in its own words – "a highly leveraged company" with over $2 billion of debt.

4. Naturally, as a result of these insider sales (often interpreted as a negative signal regarding a company's prospects) and the highly leveraged position of the Company, investors had good reason to be cautious about investing in Playtika.  Moreover, Playtika's business spanned highly scrutinized industries: the casino industry and mobile gaming industry.  These concerns were heightened by Playtika's history of growing primarily by acquiring smaller mobile game companies, instead of developing their own games in-house.

5. Thus, the central question posed by Playtika's IPO was whether insiders were cashing out of a company, in multiple challenging industries, at a time when they would reap the most financial benefits, *or* whether Playtika's impressive revenue growth and its highly lucrative loyal paying user base made it a strong investment.

6. To assuage these concerns, Playtika painted in its Registration Statement a specific narrative as to why investors should believe in the long-term prospects of the Company.

7. Playtika asserted: (a) that it was "different" from other mobile gaming companies because it viewed itself as a "technology company;" (b) that its products were not just games, but "platforms" to interact with its users; and (c) that Playtika had expertise in creating gaming experiences that are "highly personalized" to its users on these "platforms."  In light of these assertions, Playtika touted that one of its key "Core Strengths" was its "Feature Development," which was critical to keeping games "fresh" and retaining user engagement, ensuring that its tiny minority of paying users would continue to spend.

8.      As defined in the Registration Statement, "Feature Development" included aspects of the game like awarding in-game virtual coins, tokens, and specialized offers, and allowing players to play side-quest missions, challenges, and different motifs or themes of the game, as well as other in-game content (including incorporating social elements to the game where users can interact with each other) – all designed for the purpose of retaining the attention of Playtika users.  The more the users were incentivized to stay and play the game through an influx of these "features," the more likely they would be to make in-app purchases.

9.      In furtherance of this compelling narrative, Playtika repeatedly touted its ability to provide these "features" and content to users on a "***constant cadence***," and claimed that its business model was predicated upon a "***constant***" and "***consistent***" ***"cadence of novel content and feature creation that drives conversion and continued monetization***," a "***constant flow*** of new content that is highly personalized to users based on their gameplay behavior," and a "***consistent introduction*** of new content, offers, and features."[3]

10.     Thus, Playtika both recognized the importance of a "constant cadence" of features because "[f]or a game to remain popular and to retain players, we must ***constantly*** enhance, expand and upgrade the game with new features, offers, and content that players find attractive," and assured investors that it would continue to provide this "constant cadence" of new features.

11.     Yet, Defendants' statements in the Registration Statement were materially misleading because the Company had plans in place—at the time of the IPO—to implement major infrastructure changes to its two leading games that together accounted for 50% of the Company's billions of dollars in revenue: *Slotomania* and *Bingo Blitz*.

---

[3] Emphasis is added throughout the Complaint unless otherwise indicated.

12.     More specifically, at the time of the January 2021 IPO, Playtika was (i) already undertaking a demanding "18-month project" of migrating Slotomania's programming language from C-Sharp to JavaScript, and (ii) already in the "design stage" of executing a "total revamping" and complete overhaul of *Bingo Blitz*'s User Interface and corresponding "backend" *Bingo Blitz* engine.

13.     These two infrastructure changes posed significant material risks to Playtika's ability to continue on the touted "constant cadence" of feature rollouts that were critical to Playtika's revenue and success.  Indeed, one former R&D manager at Playtika explained that Playtika planned for a decrease in features as a result of the infrastructure change to *Bingo Blitz*. In other words, these risks were not only significant and material, they were understood and *expected* – notwithstanding Defendants' assertions that the "constant cadence" of features would continue.  Other former employees explained that the migration for *Slotomania* was inherently a "very complex" and "very complicated" project, and that feature development would be impacted by the migration of the programming language.  This was corroborated and further confirmed by Plaintiffs' software systems expert.

14.     Yet despite these major risks to the development of features, these infrastructure changes went undisclosed in the Registration Statement, and the "constant cadence" of features was touted without any hint of the disrupted nature of the ongoing projects in place.

15.     These risks materialized in 3Q2021, when Playtika disclosed in the 3Q2021 Earnings Call that the Company missed revenue guidance and experienced a shocking 3.6% decline in revenue.  In explaining this miss and decline, Playtika stated that it generated fewer features for *Slotomania* and *Bingo Blitz* in the quarter *because* of the previously undisclosed infrastructure projects for those games.  As confirmed by the explanations of the former

employees herein and Playtika's own admission, these infrastructure projects were already in place at the time of the IPO.

16.     As a result of the disappointing financial results—naturally a consequence of the Company deploying fewer features for the quarter—Playtika experienced the wipeout of nearly one-fourth of the company's equity value, equating to a massive 23% drop in share price on the day of the 3Q2021 Earnings Call (i.e., November 3, 2021).

17.     Plaintiffs, on behalf of themselves and the Class, therefore, bring this securities class action lawsuit to recover for losses resultant from the false and misleading statements in the Registration Statement.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to the Securities Act of 1933. Specifically, this Complaint asserts claims under: Section 11 of the Securities Act (15 U.S.C. § 77k) ("Section 11") and Section 15 of the Securities Act (15 U.S.C. § 77o) ("Section 15").

19.     Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. § 1391(b).  Playtika conducts substantial business in this district, and Defendants Playtika, Robert Antokol, Craig Abrahams, Troy J. Vanke, Wei Liu, Marc Beilinson, Bing Yuan, and Tian Lin, have all consented to venue in this district.  *See* ECF No. 42.  Substantial acts in furtherance of the alleged violations of the Securities Act or the effects of the violations have occurred in this judicial district, insofar as the shares purchased in Playtika's IPO were widely held and it is reasonable to infer individuals within this judicial district purchased those securities.

20.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

21.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ, a national exchange within the United States.

## III.     PARTIES AND WITNESSES

### A.     Plaintiffs

22.     Lead Plaintiff LBMotion, Ltd. ("LBMotion") purchased Playtika common stock pursuant and/or traceable to the Registration Statement and has been damaged thereby.  *See* ECF No. 13-3.

23.     Additional named Plaintiff Aric Rav Tilman ("Tilman") purchased Playtika common stock pursuant and/or traceable to the Registration Statement and has been damaged thereby.  *See* Exhibit 1.

### B.     Defendants

#### 1.     Corporate Defendant

24.     Defendant Playtika Holding Corp. ("Playtika" or the "Company") develops "social casino" and "social casual" free-to-play games for an international audience.  Playtika is incorporated under the laws of Delaware, with principal executive offices located at HaChoshlim St. 8 Herzliya Pituarch, Israel.  Playtika common stock is listed on the NASDAQ under the ticker symbol ("PLTK").

25.     Pursuant to the Registration Statement, Playtika issued 79,925,000 shares of its common stock at a price to the public of $27.00 per share, which included 18,518,500 shares of common stock offered by Playtika and 50,981,500 shares of common stock offered by the existing majority stockholder, Playtika Holding UK II Limited ("Playtika Holding UK").

## 2. Individual Defendants

26.     Defendant Robert Antokol ("Antokol") is Playtika's Chief Executive Officer ("CEO").  He co-founded Playtika in 2010, with Playtika's subsidiary, Playtika Ltd.  Defendant Antokol has served as Playtika's CEO since its founding and has also served as Chairperson of Playtika's board of directors since June 2020.  Prior to the IPO, Defendant Antokol oversaw the sale of Playtika from Caesars Interactive Entertainment to a consortium of investors led by Giant Investment Co., Ltd. (the "Giant Acquisition").  Defendant Antokol reviewed, contributed to, and signed the Registration Statement.

27.     Defendant Craig Abrahams ("Abrahams") has served as Playtika's Chief Financial Officer ("CFO") since October 2019, and oversees Playtika's corporate and financial strategy, inorganic growth, and capital markets initiatives.  Prior to his role as CFO, Defendant Abrahams was Playtika's President of Global Development from October 2016 to September 2019.  Defendant Abrahams has overseen more than ten acquisitions at the Company.  Defendant Abrahams reviewed, contributed to, and signed the Registration Statement.

28.     Defendant Troy J. Vanke ("Vanke") is Playtika's Chief Accounting Officer ("CAO").  Defendant Vanke has been the CAO of Playtika since September 2019, and is a Certified Public Accountant.  Prior to his executive role at Playtika, Defendant Vanke was the Chief Accounting Officer of Caesars Acquisition Company.  Defendant Vanke reviewed, contributed to, and signed the Registration Statement.

29.     Defendant Wei Liu ("Liu") has served on Playtika's board of directors since June 2020 and serves in Playtika's Audit Committee.  Since May 2016, Defendant Liu has served as director of Giant Network Group Co., Ltd.  Defendant Liu reviewed, contributed to, and signed, or authorized the signing of, the Registration Statement.

30.     Defendant Marc Beilinson ("Beilinson") has served on Playtika's board of directors since June 2020, and serves as chairperson of Playtika's Audit Committee.  Defendant Beilinson reviewed, contributed to, and signed, or authorized the signing of, the Registration Statement.

31.     Defendant Bing Yuan ("Yuan") has served on Playtika's board of directors since June 2020, and serves on Playtika's Audit Committee.  Defendant Yuan reviewed, contributed to, and signed, or authorized the signing of, the Registration Statement.

32.     Defendant Tian Lin ("Lin") has served on Playtika's board of directors since September 2016.  Defendant Lin was appointed to Playtika's board of directors in connection with the Giant Acquisition.  Defendant Lin reviewed, contributed to, and signed, or authorized the signing of, the Registration Statement.

33.     Defendants Antokol, Abrahams, Vanke, Liu, Beilinson, Yuan, and Lin may herein be referred to at times as the "Individual Defendants."

### 3.     Underwriter Defendants

34.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a financial services company that acted as an underwriter for the IPO, and disseminated the Registration Statement and solicited investors to purchase the Playtika stock issued pursuant thereto.  Morgan Stanley is a Delaware limited liability company with principal executive offices located at 1585 Broadway, New York, New York.  Morgan Stanley was allocated 18,765,000 shares in the IPO to sell to the investing public before the exercise of the over-allotment.

35.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a financial services company that acted as an underwriter for the IPO, and disseminated the Registration Statement and solicited investors to purchase the Playtika stock issued pursuant thereto.  Credit Suisse is a Delaware limited liability company with principal executive offices located at 11

Madison Avenue, 24th Floor, New York, New York.  Credit Suisse was allocated 12,510,000 shares in the IPO to sell to the investing public before the exercise of the over-allotment.

36.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a financial services company that acted as an underwriter for the IPO, and disseminated the Registration Statement and solicited investors to purchase the Playtika stock issued pursuant thereto.  Citigroup is a New York corporation with principal executive offices located at 388 Greenwich Street, Tower Building, New York, New York.  Citigroup was allocated 9,730,000 shares in the IPO to sell to the investing public before the exercise of the over-allotment.

37.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is a financial services company that acted as an underwriter for the IPO, and disseminated the Registration Statement and solicited investors to purchase the Playtika stock issued pursuant thereto.  Goldman Sachs is a New York limited liability company with principal executive offices located at 200 West Street, New York, New York.  Goldman Sachs was allocated 9,730,000 shares in the IPO to sell to the investing public before the exercise of the over-allotment.

38.     Defendant UBS Securities LLC ("UBS") is a financial services company that acted as an underwriter for the IPO, and disseminated the Registration Statement and solicited investors to purchase the Playtika stock issued pursuant thereto.  UBS is a Delaware limited liability company with principal executive offices located at 1285 Avenue of the Americas, New York, New York.  UBS was allocated 9,730,000 shares in the IPO to sell to the investing public before the exercise of the over-allotment.

39.     BofA Securities, Inc. ("BofA") is a financial services company that acted as an underwriter for the IPO, and disseminated the Registration Statement and solicited investors to purchase the Playtika stock issued pursuant thereto.  BofA is a Delaware corporation with

10

principal executive offices located at One Bryant Park, New York, New York.  BofA was allocated 5,560,000 shares in the IPO to sell to the investing public before the exercise of the over-allotment.

40.     Robert W. Baird & Co. Incorporated ("Robert Baird") is a financial services company that acted as an underwriter for the IPO, and disseminated the Registration Statement and solicited investors to purchase the Playtika stock issued pursuant thereto.  Robert Baird is a Wisconsin corporation with principal executive offices located at 777 East Wisconsin Avenue, Milwaukee, Wisconsin.  Robert Baird also has an office and conducts business in New York.  Robert Baird was allocated 1,042,500 shares in the IPO to sell to the investing public before the exercise of the over-allotment.

41.     Cowen and Company, LLC ("Cowen") is a financial services company that acted as an underwriter for the IPO, and disseminated the Registration Statement and solicited investors to purchase the Playtika stock issued pursuant thereto.  Cowen is a Delaware limited liability company with principal executive offices located at 599 Lexington Avenue, 20th Floor, New York, New York.  Cowen was allocated 695,000 shares in the IPO to sell to the investing public before the exercise of the over-allotment.

42.     Stifel, Nicolaus & Company, Incorporated ("Stifel") is a financial services company that acted as an underwriter for the IPO, and disseminated the Registration Statement and solicited investors to purchase the Playtika stock issued pursuant thereto.  Stifel is a Missouri corporation with principal executive offices located at 501 North Broadway, St. Louis, Missouri. Stifel has multiple offices in New York, New York.  Stifel was allocated 695,000 shares in the IPO to sell to the investing public before the exercise of the over-allotment.

43.     Wedbush Securities Inc. ("Wedbush") is a financial services company that acted as an underwriter for the IPO, and disseminated the Registration Statement and solicited investors to purchase the Playtika stock issued pursuant thereto. Wedbush is a California corporation with principal executive offices located at 1000 Wilshire Boulevard, Suite 900, Los Angeles, California.  Wedbush has multiple offices in New York, New York.  Wedbush was allocated 1,042,500 shares in the IPO to sell to the investing public before the exercise of the over-allotment.

44.     Defendants Morgan Stanley, Credit Suisse, Citigroup, Goldman Sachs, UBS, BofA, Robert Baird, Cowen, Stifel, and Wedbush may herein be referred to at times as the "Underwriter Defendants."

### C.     Confidential Witnesses

45.     This Complaint references four (4) confidential witnesses, who were all former employees at Playtika.  They shall be referred to herein under the designation "CW."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Playtika's January 15, 2021 IPO

46.     Playtika describes itself as "one of the world's leading developers of mobile games" that are free-to-play.  Particularly, Playtika develops and operates "social casino" and "social casual" games that can be played on a user's mobile phone or on the web.

47.     Social casino games are based around well-known casino games like poker or slot machines, but players cannot bet or win real money.  Players can only play the game using Playtika's virtual currency or virtual tokens.  As a result, the traditionally simplistic casino games — which presumably are entertaining due to the risk and reward they offer — are modified to integrate features such as special missions or "mini-games" within the game, personalized offers to certain users, unique play mechanics, special events, interaction with other

players through chat or leaderboards, and other content that entice players to continue playing. Social casual games include games such as puzzles, bingo, and board games that can be played on mobile devices.

48.     Both types of games (social casino and social casual), typically allow players to play with or against each other.  Playtika states: "By integrating social features like gifting, messaging, and leaderboards, users become more immersed as they find other players with similar playing habits, interests, and levels of engagement."  Further, Playtika distributes its games to the end user through various web, mobile, and social media platforms, including Apple, Facebook, and Google, as well as its own proprietary platforms.

49.     Because users do not gamble with actual money on the games, Playtika derives nearly all of its revenues from in-app purchases.  This business model is often referred to as "freemium," because the games are free to play, but offer in-game options at an added cost.  In-game purchases can range from chips to play, "items" that provide aesthetic changes to the game, and purchase of virtual tokens, coins, skins, and other digital items.

50.     Playtika was founded in 2010, in Israel, by Defendant Robert Antokol and Uri Shahak, and released its first game, *Slotomania*, that same year.  Shortly thereafter, in May 2011, the Company was bought by Caesars Interactive Entertainment, Inc. ("CIE").

51.     Playtika asserted that "[h]istorically, a significant portion of our growth has been as a result of our acquisition of complimentary studios and games, rather than in-house development[.]" Acquisition of new games and studios was thus a "key element" of Playtika's business strategy, as described by Playtika in the Registration Statement, and this pattern and focus of acquisition over development was present since Playtika's inception.

52.     To that end, starting in 2011 and under CIE's ownership, Playtika expanded its game portfolio by acquiring *Bingo Blitz* (2012), *World Series of Poker* (2013), *House of Fun* (2014), among other game studios.

53.     In 2016, Playtika was acquired by a private equity consortium led by Giant Investment Co., Ltd. ("Giant") for $4.4 billion.  Playtika's playbook of favoring acquisition over development continued under Giant's control, as Playtika continued to acquire more game studios, including *Jelly Button* (2017), *Wooga* (2018), *Supertreat* (2019), and *Seriously* (2019).

54.     On December 18, 2020, Playtika filed a Registration Statement on Form S-1 with the SEC, in connection with its January 2021 IPO.  On January 7, 2021, Playtika filed an amended Registration Statement on Form S-1 with the SEC.  The Registration Statement was declared effective by the SEC on January 14, 2021.

55.     On January 15, 2021, Playtika filed a Prospectus on Form 424B4 with the SEC in connection with the IPO (the "Prospectus"), which was incorporated into and formed part of the Registration Statement (the Prospectus and the Form S-1, as amended, are referred to collectively herein as the "Registration Statement").

56.     On January 15, 2021, pursuant to the Registration Statement, Playtika's securities began trading on the NASDAQ under the symbol "PLTK."

57.     Prior to the IPO, Playtika Holding UK owned 378,000,000 shares of common stock, or 96.7% of the Company, making it Playtika's controlling majority shareholder.  Notably, in the IPO, Playtika Holding UK sold off a large portion of its shares.

58.     According to the Registration Statement, Playtika Holding UK was 100% owed by Alpha Frontier Limited, a company that was "indirectly controlled by Giant Investment Co., Ltd., [i.e., Giant] which in turn is controlled by Yuzhu Shi."  As was disclosed, "Yuzhu Shi is a

Chinese national and Giant is a Chinese company that indirectly control our controlling stockholder, Playtika Holding UK."

59.     In the Registration Statement, Playtika disclosed that Playtika Holding UK would then dispose of 50,981,500 shares of common stock, with the option to include an additional sale of 10,425,000 shares of common stock to the underwriters, if such underwriters chose to exercise their options to purchase.  As a result, through the IPO, Playtika Holding UK would reduce its ownership stake from 96.7% to 77.3%.

60.     In contrast, Playtika itself would only sell 18,518,000 shares of common stock as new issuances, and would "not receive any of the proceeds from the sale of shares by the selling stockholder."

61.     As the IPO price was $27.00 per share, this indicated that Playtika would receive only approximately $500 million as a result of the IPO, while its majority shareholder—Playtika Holding UK—would receive approximately ***$1.657 billion***.

62.     Thus, of the total of $2.16 billion sold in the IPO, the Company would receive only 23.2% of the total raised money.  In addition, the Registration Statement disclosed that Playtika carried $2.237 billion of "long term debt" under its liabilities.[4]

63.     Investors naturally had reason for concern about the IPO and the corresponding signal to the market, given that this same majority inside shareholder was selling a ***significant*** position (decreasing ownership from 96% to 77%) and the Company itself would only receive 23% of the total raised funds through the IPO.

64.     Investors were therefore concerned about Playtika's business model and long-term potential for success.

_____

[4] This debt was accrued to fund Playtika's issuance of a $2.4 billion cash dividend to Playtika Holding UK in August 2019.

65.     Indeed, on December 2020, analysts and reporters in the gaming industry stated in

an article entitled *Playtika's IPO filing reveals $2.3 billion in revenues and $2.3 billion in debt*:

> As for the debt, Playtika describe the amount as significant and said "we are a
> highly leveraged company." Playtika mentioned this as one of its risk factors. ***That
> debt could hurt the company's capability to raise more capital or fund its
> operations.*** The company still has a $350 million line of credit, and it plans to raise
> that to $550 million. For the past nine months, the company made $93.7 million in
> principal payments and $139.2 million in interest payments. The interest payments
> are now higher than they used to be.[5]

66.     Bloomberg Law News wrote in anticipation of the IPO that:

> Playtika Holding Corp. filed for an initial public offering, ***disclosing shrinking
> profit on increased revenue this year.*** The Israel-based company in its filing
> Friday with the U.S. Securities and Exchange Commission listed the size of the
> offering as $100 million, a placeholder that will likely change. The company had
> net income of $16 million on revenue of $1.8 billion for the nine months ended
> Sept. 30, according to the filing. That compared with net income of $259 million
> on revenue of $1.4 billion in revenue during the same period last year.

67.     And four days before the IPO, on January 11, 2021, *Master the Meta*, a newsletter

"focused on analysing [sic] the business strategy of the gaming industry," stated and concluded:

> Additionally, ***Playtika's MAU***[6] ***has suffered from some stagnation since Q1 2019
> and no growth over 2020***. This could reflect ***hitting a portfolio-wide user
> acquisition ceiling***, which has also been a ***long-standing issue in the Casino genre***.
> User acquisition is not going to get any easier post-IDFA,[7] and ***Playtika's cash cow
> games are typically dependent on finding, acquiring, and retargeting high value
> "whale" players. . . . All considered, squeezing the lemon can only go so far,
> which means there's growing pressure for the next two growth opportunities to
> better contribute.***

***

---

[5] Dean Takahashi, *Playtika's IPO filing reveals $2.3 billion in revenues and $2.3 billion in debt,*
VENTUREBEAT (Dec. 22, 2020).

[6] MAU refers to Monthly Active Users, i.e., a measure of how many users play Playtika's games
over a monthly period.

[7] This refers to Apple's decision to make the Identifier for Advertising ("IDFA")—which
identified users on apps to aid in targeted advertising—explicitly "opt-in" for every single app in
the Apple platform, as opposed to opt-out. *See* John Koetsier, *Apple Just Crippled IDFA,
Sending An $80 Billion Industry Into Upheaval,* FORBES (Jun. 24, 2020),
https://www.forbes.com/sites/johnkoetsier/2020/06/24/apple-just-made-idfa-opt-in-sending-an-
80-billion-industry-into-upheaval/?sh=245b2357712c.

Overall, Playtika is a decent business . . . *[b]ut we're not blown away*. Their casino revenue probably lacks meaningful upside, and a lot needs to be proven out in casual. *MAU growth is stagnating and user acquisition will not get any easier post-IDFA*. Success with new games is sporadic and needs to accelerate. *And given the company's heavy debt load, Playtika's not entering the public market in excellent financial health,* which could affect its ability to strike big deals at great terms. In a nutshell, while Playtika has executed well until now and there is abundant opportunity left, *it's unclear what exactly will drive long-term growth, which adds risk.*[8]

68.     Therefore, on January 15, 2021, the same day as the IPO and the filing of the

Prospectus, and prior to shares going live on the NASDAQ, Defendant Robert Antokol as CEO

of Playtika went on *CNBC Market Alert* and assuaged those market concerns:



69.     In response to business model concerns, Defendant Antokol highlighted that the

core differentiating aspect of Playtika was that it was a "technology company" that viewed its

mobile games as a "platform," and that "every move" that Playtika makes is based on "data."  As

---

[8] Pocket Gamer, *Master the Meta*: *What you need to know before Playtika's IPO* (Jan. 11, 2021), https://www.pocketgamer.biz/news/75474/master-the-meta-what-you-need-to-know-before-playtikas-ipo/.

such, its mobile games, like *Slotomania*, would be getting "fresh content **every week**" or "**every two weeks**." As a result, Playtika would be "different" than other mobile companies in the casual gaming industry which have not been as successful:

> **CNBC**: Walk us through sort of the playbook of the business model.  Gaming of course has been well chewed upon by the Street lately.  What makes Playtika different?
>
> **Antokol**: So thanks for the question.  So Playtika was established 10 years ago, and actually we started with one game on one platform.  From this day, we started to look at our games a little bit different than the others.  ***We look at our games as a platform***, so we still have more than four games that running more than seven years and still growing. When you look at the top one hundred games in the US, nine of these games are Playtika games.  So we are a little bit different than the others. We are more stable. We are growing, we are a cash positive company from day one, and we have a little bit different story than the other mobile companies.
>
> **CNBC**: Robert, you guys kind of snuck up on me in the sense that *Zynga*, people were talking about that a lot in the initial Facebook era. And it's had a lot of struggles with the casual gaming. There's some other companies that had have struggles with it and along comes Playtika and, and, you guys are getting a lot of attention and seem to be doing well.  What are you doing differently model wise than some of the earlier players in the more social gaming space?
>
> **Antokol**: So I, I think there is few big differences. ***First we have unbelievable technology*** that's running with us from day one and ***we are a technology company***. ***Second, we look at data, everything that we do, every new product, every move, everything around games, is based on data.*** It's not hunch. It's not say saying maybe it would work, maybe not  - everything on data. And third, as I said in the beginning, we look at our games like they're here to stay. They're not going anywhere. So, *Slotomania* began and it's running 10 years already and growing year after year after year, ***because we look at it as a platform***, there ***is a platform that's called Slotomania and getting fresh content every week, every two weeks***. So it's a little bit different. I know that we are a different animal that they, people used to see other mobile companies around the world. We have a different approach and we are very excited about the future and that everyone will know Playtika very soon.

70.     Playtika specifically reaffirmed this philosophy, by stating in the Registration Statement under a section entitled **How We Are Different**[9] and under <u>Philosophy</u>:

---

[9] Emphasis in original.

We take a fundamentally different approach to operating games.  In our industry, games are often viewed as having finite lifespans.  When introduced, they leverage fresh content to start strong and then fade over time as users become familiar.  We take the opposite position, and instead seek to operate our games as platforms that users can interact with for decades.  ***To achieve this longevity, we provide a constant flow of new content that is highly personalized to users based on their gameplay behavior***.

71.  Playtika thus chose to communicate four specific things to the market through the IPO and corresponding Registration Statement: (1) even in light of the majority shareholder selling a significant portion of their shares in the IPO, and Playtika only receiving 23.2% of the funds raised, Playtika's business will operate successfully (and not fall down the path of its competitors) through its "different approach" to casino/casual mobile gaming;  (2) Playtika's different approach was that it viewed each of its mobile games not just as games or products, but "as a platform" that "users can interact with;" (3) in that regard, Playtika viewed itself primarily as a "technology company" where "everything that we do, every new product, every move, everything around games, is based on data;" and (4) because of this distinct approach compared to its competitors, Playtika's business model in order to achieve longevity was to "provide a constant flow of new content that is highly personalized to users" and to produce "fresh content every week" or every "two weeks" – which drove growth and allowed legacy games like *Slotomania* to stay in business for a decade.

**B.**  **Playtika's Entire Business Model Was Based Off an Extreme Hyper-Focus on a Tiny Subset of Paying Customers**

72.  Playtika's mobile games are free to download and play.  Playtika therefore does not make money off the initial download of a mobile game in its portfolio.

73.  Instead, Playtika derives ***more than 97%*** of all of its revenues from in-game purchases.  In-game purchases refers to the purchase of virtual items (or virtual currency) by consumers within each mobile game.

74.     To that end, Playtika repeatedly highlighted in the Registration Statement that "we generate nearly all of our revenues from the sale of virtual items when players make voluntary in-game purchases.  For example, in each of the nine months ended September 30, 2019 and 2020, we derived *97.7% and 97.2%,* respectively, of our revenues from in-game purchases."

75.     The Registration Statement further disclosed that for the nine months ending September 30, 2020, Playtika earned $1.798 billion of revenue.  Thus, 97.2% of $1.798 billion was derived solely from in-game purchases alone – represented in blue on the pie chart shown below (as opposed to other sources of revenue like advertising, etc., represented in red below):



76.     Therefore, for the nine months ending September 30, 2020, in-game purchases by consumers generated about *$1.747 billion* of revenue for Playtika.

77.     Importantly, the revenues derived from in-game purchases are not equally spread out amongst all Playtika users.  Instead, Playtika disclosed that an extremely small minority of users make in-game purchases.

78.     To measure such monetization from the Playtika consumer base, Playtika monitors three major key performance metrics: (i) Daily Active Users ("DAUs"); (ii) Daily Paying Users ("DPUs"); and (iii) Daily Payer Conversion ("DPC").

79.     DAUs was defined in the Registration Statement as "the number of individuals who played one of our games during a particular day on a particular platform," and was described by Playtika as "a useful metric to measure the scale and usage of our games."

80.     DPUs was defined in the Registration Statement as "the number of individuals who purchased, with real world currency, virtual currency or items in any of our games on a particular day," and was described by Playtika as "a useful metric to measure game monetization."

81.     DPC was defined in the Registration Statement as "the total number of DPUs . . . divided by the number of DAUs on a particular day," and was described by Playtika as "a useful metric to measure . . . the monetization of our users."

82.     These performance metrics are illustrative of monetization.  For example, assuming that a Playtika mobile game has 100 DAUs on a single Thursday, and only 3 of those users purchased a virtual item in the game with real world dollars – there would be 3 DPUs (Daily Paying Users), and the DPC would therefore be 3% for that Thursday.

83.     Given that Playtika's games operate on a "freemium" model in which installation and download of each mobile game generates practically no revenue, the monetization of the

consumer base through in-app purchases is extremely important to the Company's health and success, and thus, investors cared significantly about the metrics above.

84.     Playtika used those same metrics to indicate "average" DAU / DPU / DPC over a given time period, including a given fiscal quarter, or multiple fiscal quarters.

85.     In the Registration Statement, Playtika disclosed that for the nine months ended September 30, 2020, there were 11.4 million average DAUs, but only 290,000 DPUs who actually paid real world currency for in-game purchases, thus representing that 2.5% of users paid for in-app items for that time period (i.e., a 2.5% DPC).  This percentage is represented in yellow in the pie chart shown below:



86.     As shown above, only 290,000 Daily Paying Users generated the ***$1.747 billion*** that was accounted for the nine months ending September 30, 2020 – indicating that each DPU spent roughly $6,026 on in-app purchases over the course of 9 months, or about $2,000 per fiscal quarter.

87.     In other words, **only 2.5% of the population** of Playtika mobile game users account for 97-98% of the Company's revenues, which for the twelve months ended 3Q2020 was $2.286 billion.

88.     Further, Playtika disclosed in its Registration Statement that this percentage of paying users, compared to the total population of users, has remained historically small; for the year ended December 31, 2017; 2018; and 2019, the percentages were 1.9%; 2.2%; and 2.1%, respectively.

89.     These figures thus represent an important principle: it was essential that Playtika maintained the engagement of these paying users, as each paying user (i.e., DPU) disproportionally accounted for a huge percentage of the revenue and profits created, in comparison to regular active users (i.e., DAU) who play the game but do not buy virtual tokens, currency, or other in-app products.  In other words, DAUs were not the important metric *per se*, rather, the DAUs who actually purchased the in-app items were what mattered for growing revenues (i.e., the DPUs).

90.     This conclusion was ultimately reinforced by what was disclosed in the 3Q2021 Earnings Call by Playtika.  In response to analyst concern over decreasing DAUs, which were down in the quarter, Defendant Antokol stated that "And the last thing, as [I'm] always saying in the call, this is not the main focus of the company. We are not looking at this number [DAUs] like this is the number.  We saw in the first quarter [of 2021], *we were down in the DAU,* and our revenues grew dramatically. ***So it doesn't affect any of our revenues***, but it's a number that we are looking at and trying to understand how to bring the quality DAU, not only the big number."

91.     Indeed, as Playtika disclosed in the Registration Statement, its business model was therefore highly dependent and targeted on maintaining the engagement of the small minority of users who actually contribute to overall revenues:

> Revenues of free-to-play games typically rely on a small percentage of players who spend moderate or ***large amounts of money in games to receive special advantages, levels, access and other features, offers, or content***. The vast majority of users play for free or only occasionally spend money in games. ***As a result, compared to all users who play our games in any period, only a small percentage of such users were paying users***. For example, for the nine months ended September 30, 2020, our average Daily Payer Conversion was 2.5%. ***In addition, a large percentage of our revenues comes from a small subset of these paying users***. Because many users do not generate revenues, and each paying user does not generate an equal amount of revenues, it is particularly important for us to retain the small percentage of paying users and to maintain or increase their spending levels*.

92.     Thus, Playtika disclosed that this tiny percentage of users spent large amounts of money *in order* to receive features or other content.  Additionally, Playtika disclosed not only that its revenues are derived from a tiny minority of users that pay for in-app products, but that a "large percentage of our revenues comes from a small subset of these paying users," indicating that the percentage of individual consumers responsible for the massive $2.286 billion of revenue was likely even smaller than 2.5% of their consumer base – *i.e.*, not every DPU within the 2.5% subset population pays equally for in-app purchases.

### C.     Playtika's Revenues Depend on a "Constant Cadence" of Product Features and Content

93.     Playtika explained that in order to maintain or increase the levels of paying users, it needed to make sure that these users were constantly engaged.  For example, Playtika stated that "[t]he most successful free-to-play games require the ***consistent introduction of new content, offers, and features***, a highly quantitative approach to managing in-game economies, and a design that is both engaging either as a primary source of entertainment or as a second screen."  As described in the Registration Statement, "product features" refers to in-game

24

features and new content in the game that retain or increase user engagement, "including awarding in-game virtual items, providing engaging new game themes, motifs, challenges and in-game missions, as well as in-game chat and messaging capabilities." And as seen above, Playtika players spend money in order to receive these "special advantages, levels, access and other features, offers, or content" (i.e., "features" or "content") within the Playtika games.

94.     Playtika not only asserted this principle in the context of its business model that was necessary for revenues, but one that was in alignment with Playtika's core "Philosophy." Indeed, Playtika touted under a section entitled "**How We are Different**:"[10]

> *We take a fundamentally different approach to operating games*.  In our industry, games are often viewed as having finite lifespans.  When introduced, they leverage fresh content to start strong and then fade over time as users become familiar.  We take the opposite position, and instead seek to operate our games as platforms that users can interact with for decades.  *To achieve this longevity, we provide a constant flow of new content that is highly personalized to users based on their gameplay behavior*.

95.     To that end, Playtika touted to investors in the Registration Statement that one of its "**Core Strengths**"[11] was its "**Feature Development**."[12]  Under this section, Playtika stated that: "We are experts at creating features and player experiences that optimize player engagement, resulting in increased conversion and monetization."  As a result, Playtika promised that:

> *We are focused on continuing to implement and enhance features* that keep games fresh and increase user engagement, including awarding in-game virtual items, providing engaging new game themes, motifs, challenges and in-game missions, as well as in-game chat and messaging capabilities.  We serve these features to our users based on their preferences and the optimal timing during each player's gameplay.

---

[10] Emphasis in original.
[11] Emphasis in original.
[12] Emphasis in original.

96.     As stated in the Registration Statement, Playtika's business model was therefore predicated upon a "*consistent cadence* of novel content creation that drives conversion and continued monetization" and a "*constant flow* of new content."

97.     Indeed, Playtika repeatedly told investors in the Registration Statement that monetization and revenues depend on a constant cadence of product game features and content in order to retain user engagement:

(a)     "Throughout the lifecycle of our games, we dedicate substantial operational resources and team members to support a constant cadence of novel content and feature creation that drives conversion and continued monetization."

(b)     "Our players love our games because they are fun, creative, engaging, and kept fresh through a steady release of new features that are customized for different player segments."

(c)     "Our revenue growth has been driven by improving the content, offers, and features in our existing games and the release or acquisition of new games.  In order to enhance the content, offers, and features in our existing games and to develop or acquire new games, we must invest a significant amount of our technological and creative resources, ensuring that we support a consistent cadence of novel content creation that drives conversion and continued monetization.  These expenditures generally occur months in advance of the release of new content or the launch or acquisition of a new game."

(d)     "By delivering content, offers, and features to users at the right times during their gameplay, we drive paying user conversion, continued monetization, and long-term paying user retention.  For example, we have grown revenues for our first and largest title, *Slotomania*, at a 35% compound annual growth rate between the years ended December 31, 2011

26

and December 31, 2019, with 89% of revenues for the year ended December 31, 2019 for

*Slotomania* coming from users who downloaded or first played the game in 2017 or earlier."

     (e)    "By integrating social features like gifting, messaging, and leaderboards,

users become more immersed as they find other players with similar playing habits, interests, and

levels of engagement."

     (f)    "Through frequent content and feature updates, and our technology-driven

live operations capabilities, our games provide highly tailored experiences to users.  By serving

content, offers, and features to users at the right times during their playing cycle, we are able to

achieve impressive engagement, monetization and retention outcomes."

     (g)    "The combination of these acquisitions and improvements to

monetization, new content and product features drove an increase in both DAUs and DPUs [for

the years ended December 31, 2018 and 2019]."

     (h)    "We aim to increase our monetization of users primarily through

increasing the degree of engagement our users have with our games.  Leveraging our live

operations expertise to build games that are engaging and monetizable, we seek to generate

increased value on a per player basis by continuously optimizing our content to drive user

engagement and retention."

    98.    Thus, Playtika was clear with its investors that its monetization and revenues were

inextricably linked with the ***constant*** introduction of features and content.

    99.    In the Registration Statement, Playtika utilized its recent acquisition of the

*Solitaire Grand Harvest* mobile game to illustrate the importance of a "constant cadence" of

product features.  Playtika asserted that:

> At its core, solitaire is a game that has been played for hundreds of years and has
> largely remained unchanged. However, we have added new content and social

elements ***consistently*** to the game since we acquired it in 2019, with a goal of making the game more fun and competitive for users, and fresh for those users who have played for years. We use our data driven approach to user engagement to construct personalized gameplay supported by the dynamic insertion of new features, such as tailored bonuses and multipliers, holiday or location motifs, as well as challenges and missions. We increased average DPUs by 2.1x for *Solitaire Grand Harvest* from June 30, 2019, the first full quarter after we acquired the game, to the quarter ended September 30, 2020, outpacing the increase in average DAUs, which we grew by 1.6x during the same period.

100.    Further, as illustrated and exemplified above, Playtika repeatedly told investors that the monetization of its games was contingent on retaining the engagement levels of not just the Playtika user base as a whole, but on a small minority of paying users (i.e., 2.5% of overall users).

101.    In addition, Playtika repeatedly emphasized the importance of a "constant cadence" of product features and content not only to retain DPUs and their engagement, but also to ***convert*** some DAUs into DPUs (i.e., convert active users that don't purchase any in-app items, into those who do):

(a)     "While our games are free-to-play, we generate substantially all of our revenues from players' purchases of in-game virtual items. Revenues from in-app purchases accounted for 97.2% of revenues in the nine months ended September 30, 2020. Our financial performance is dependent, in part, on our ability to convert more active players into paying players and sustainably grow user spend over the long term. In the quarter ended September 30, 2020, our average Daily Payer Conversion was 2.6%, reflecting a decrease from 2.7% in the previous quarter. ***Our players' willingness to consistently make in-app purchases is impacted by our ability to deliver engaging content and personalized user experiences***."

(b)     "We consistently generate new data and insights that we use to improve how we manage our games.  Through our dedication to providing new content, feature optimization and customization, we have increased average Daily Payer Conversion from 2.1%

for the nine months ended September 30, 2019 to 2.5% for the nine months ended September 30, 2020, an increase of 19.0%. We intend to continue to explore new strategies to improve our conversion of users into paying users, including continued game enhancements and data-driven user management strategies."

(c)    "The combination of these factors—acquisitions, improvements to monetization, new content and product features and the increased engagement—drove an increase in both DAUs and DPUs, resulting in the overall increase to payer conversion."

(d)    "By delivering content, offers, and features to users at the right times during their gameplay, we drive paying user conversion, continued monetization, and long-term paying user retention."

(e)    "Successful execution of our strategy depends on our continuous ability to attract and retain players, expand the market for our games, convert inactive players into paying users, maintain a technological edge and offer new capabilities to players."

102.    Playtika also asserted that "[w]e monitor our analysis of customer play behavior on a quarterly basis," and that "[w]e monitor our operational data and player patterns and re-assess our estimates on a quarterly basis." Playtika also provided the monetization metrics (DAU, DPU, and DPC), on a quarterly basis.

103.    Thus, these repeated statements throughout the Registration Statement assured investors that because user engagement was dependent on the "consistent" deployment of features on a regular basis, Playtika had been and would be "continuing" to deploy—on a "constant cadence"—these critical product features.

104. Indeed, prior to the IPO, and consistent with the representations made in the Registration Statement, Playtika users had grown to expect features and content to be rolled out on this "constant cadence" that was touted.

105. For example, on January 25, 2020, Playtika through its *Bingo Blitz* Facebook page asked its users to complete a survey.  In response to this survey, users expressed the importance of the *Bingo Blitz* game features and expressed frustration when the new features were not rolled out on the schedule that they had grown to expect.  Likewise, users complained on the *Bingo Blitz* Facebook page when features were not available as expected.  Similarly, on the *Slotomania* Facebook page, users raised concerns and complained when features they were expecting were not delivered; Playtika even responded that the demanded feature would be rolled out "very soon" in an attempt to assuage those users.

**D.    *Slotomania* and *Bingo Blitz* Are Playtika's Most Important and Profitable Games By Far, Accounting for Half of the Company's Total Revenues**

106. Thus, the importance of maintaining a "constant cadence" and frequent introduction of new game features for users cannot be overstated.

107. However, the importance of maintaining such a "cadence" was particularly heightened for two of Playtika's games: *Slotomania* and *Bingo Blitz*.

108. The profile of each game is listed as follows, as asserted by Playtika in the Registration Statement:

(a)    ***Slotomania***

 

"#1 game worldwide in the social slots genre. Launched in 2010. *Slotomania* is the premier social slots game with over 1.469 million average DAUs in the quarter ended September 30, 2020 and a Facebook Supergroup with over 640,000 members as of September 30, 2020. *Slotomania* offers over 280 original slot machines where players can progress through "SlotoQuests" to earn in-game virtual rewards and virtual coins, as well [as] "Playtika Rewards", where players earn virtual rewards by playing all of Playtika's games. Social interaction is enhanced through the ability to join "SlotoClans" where users are able to team-up and earn "clan points" to unlock additional virtual rewards as well as connecting with friends on social media platforms to send and receive virtual gifts. Other social features include "SlotoCards" and the "SlotoClub" challenges to further bolster user-level engagement. Players are able to purchase virtual items, including virtual coins, boosts and other items within the game to further their progression and unlock more virtual rewards. *Slotomania* has been a staple in the U.S. mobile games market and has been a top 10 grossing mobile game in each of the last 8 years."

(b)     ***Bingo Blitz***

 

"#1 game worldwide in mobile bingo-themed genre.  Launched in 2010.  Acquired in 2012. *Bingo Blitz* provided a bingo adventure to over 900,000 average DAUs in the quarter ended September 30, 2020. Our users progress through various levels in the theme of major global cities and are able to connect with others to earn virtual items and bonuses, including additional virtual coins and power-ups. Within each city, players collect treasures through playing original bingo games that feature an innovative twist to the classic bingo genre. Players are able to play multiple virtual bingo cards that include power-ups, multipliers, treasure chests and other features to enhance gameplay. As a player travels from city to city, there are a number of other secondary goals, such as quests and special event rooms to unlock additional virtual items. Players are able to purchase various virtual items in the in-app store to enrich their mobile bingo adventure."

109.    Playtika disclosed in its Registration Statement that *Slotomania* was the first game that the Company developed, and that it accounted for a "significant portion" of Playtika's revenue as Playtika's "first and largest title."

110.    Indeed, the following chart that was published in the Registration Statement illustrates that *Slotomania* was Playtika's most important game in terms of revenues:



111.    As shown above, for the 12 months ended 3Q2020, *Slotomania* generated $724 million out of $2.286 billion, or **31.7%** of the total Company's revenues – **almost a third of Playtika's revenues.**[13]  *Slotomania* has remained Playtika's largest game for over a decade.

112.    In describing *Slotomania*, Playtika stated "[f]or example, we have developed core gameplay features, such as collectibles and piggy banks, that users have grown to love.  Once successful, we have incorporated these features across our portfolio of games to drive engagement, monetization and retention.  Below are some examples of such features[:]"

---

[13] And in 2017, *Slotomania* accounted for $514 million of $1.151 billion of revenues, or 44.66%.

| Feature | Developed for Slotomania | Features Applied to Other Games |
|---|---|---|
| **Collectible Cards**<br>*Users collect cards and can win virtual items when they complete sets* |  |  |
| **Piggy Bank**<br>*Progressively fills over time, giving users increasingly greater amounts of virtual currency when they "break" the piggy bank* |  |  |

113.    Thus, *Slotomania* was strongly cemented in Playtika's gaming portfolio as Playtika's most important and profitable game to the Company.

114.    In addition to *Slotomania*, Playtika disclosed in its Registration Statement that *Bingo Blitz* was Playtika's second most important and profitable game in terms of revenues.  For the 12 months ended 3Q2020, *Bingo Blitz* generated $417 million out of $2.286 billion, or **18.2%** of the total Company's revenues.[14]

115.    Thus, as disclosed by Playtika in the Registration Statement, for the 12 months ended 3Q 2020, *Slotomania* and *Bingo Blitz* collectively generated about **49.9%** of Playtika's revenues – *i.e.*, **half of the Company's revenues.**  Further, Playtika stated: "for the years ended

---

[14] And in 2017, *Bingo Blitz* accounted for $154 million of $1.151 billion of revenues, or 13.38%.

December 31, 2018 and 2019, our top two games by revenue, *Slotomania* and *Bingo Blitz*, collectively generated ***more*** than half of our revenues for each period."

116.    As further stated by Playtika, and referring to *Slotomania* and *Bingo Blitz* – "a limited number of games generate a majority of our revenues" and "a small percentage of total users generate a majority of our revenues[.]"

117.    Thus, any material changes to *Slotomania* or *Bingo Blitz*'s ability to generate revenues out of its core population of paying users would have an outsized impact on the Company as a whole, since the largest portion of its revenues are derived from that population.

118.    Importantly, failure to provide a "consistent cadence" of product features and in-game content for the *Slotomania* and *Bingo Blitz* games would cause user engagement to decrease in each game, and as a result, produce a material decrease to the Company's revenues.

119.    Former employees of the Company support the connection between developing and deploying constant new features in these two games and maintaining or growing revenue.

120.    CW-1, a former R&D manager at Playtika who worked at the Company from before 2018 to mid-to-end of 2021, explained that product features were "very important" to Playtika's revenues.  CW-1 explained that features helped increase revenue and daily active users and renew interest in users who had abandoned the game.

121.    CW-1 also stated that even though Playtika's monthly active users were decreasing for its core games such as *Slotomania* and *Bingo Blitz* during roughly the final two years of CW-1's tenure at the Company (i.e., from 2019 to 2021), Playtika's revenues nonetheless were increasing over the same period because its most loyal players would pay more money for their games.  CW-1 described this practice as akin to "squeezing lemons," stating that "Playtika was squeezing as much money as possible from their shrinking user base."  CW-1

34

recalled that Playtika sent these loyal users personalized offers and the users would "spend and spend and spend."

122.    Indeed, CW-1 stated that "new features needed to be designed" in order to "earn more from each customer," and that the rate of features rollout was about once every two weeks or so.

123.    CW-1 described that there were two aspects of feature development: (1) development and rollout of new features, and (2) redesign of current features in the game.

124.    CW-2, a former UI/UX Designer[15] at Playtika, also confirmed that new product features had an impact on revenue because they helped prevent players from leaving the games and kept current players engaged with the game.  CW-2 explained that if there are fewer product features in development, "revenues go down."  Further, CW-2 explained that the creation of product features would likely take about a quarter, or three months to complete, depending on the size of the feature, and that to create product features, a "task force" was developed for each feature.

125.    CW-4, a former Software Engineer who worked at Playtika since before the January 2021 IPO until the summer of 2021, explained that each product feature had a "product owner" on the business side who gives the feature's requirements, as well as a team comprised of at least one backend developer, one frontend developer, an artist and one or two testers.  CW-4 recalled that multiple teams could work on the same feature.  CW-4 further stated that the teams that developed features worked on a "tight schedule," as Playtika occasionally announced an upcoming product feature to its users before it launched.  CW-4 also stated that "Playtika had a lot of statistics for everything," and that "each quarter they gave bonuses based off performance

---

[15] UI/UX stands for "User Interface" / "User Experience."

of the game." CW-4 recalled that the bonuses were very high at the beginning of the pandemic in 2020 but began to decline at the beginning of 2021 given that the effects of the pandemic were in decline.

126.    CW-3, a former Software Engineer who worked at Playtika from the end of 2017 until the first quarter of 2020, explained that when rolling out features, there was a chain of command and that the leadership for the product tracked and managed the schedule of feature implementation. CW-3 also explained that there were business project managers for each game and a monetization team for each game.

### E.    The Company Had Plans in Place—Prior to the IPO—to Materially Change the Infrastructure of Each Game, Which Were Not Disclosed

127.    Despite the importance of features, prior to the IPO, there were material infrastructure changes in development for both *Slotomania* and *Bingo Blitz*, which were undisclosed in the Registration Statement and placed this "constant flow" of features at risk.

128.    Three quarters after the IPO, on November 3, 2021, Defendant Abrahams disclosed in Playtika's 3Q2021 Earnings Call that "our actual Q3 results were down 3.6% sequentially" – with actual revenues of $636 million for the quarter, missing analyst consensus of $664 million. Playtika also revised its full year revenue guidance downward to $2.57 billion (down from $2.6 billion) and revised its full year adjusted EBITDA guidance downward to $980 million (down from $1 billion).

129.    Thus, not only did Playtika miss 3Q2021 expectations, the Company also stated that as a result of the issues that were disclosed, its performance in *4Q2021* would be reduced. Indeed, as stated by Defendant Abrahams in response to an analyst question concerned about the revision in guidance, "[i]n terms of the broader portfolio, we guided the back half of the year to be flat because we saw comparatively *fewer new promotions and features as a result of some of*

*the infrastructure enhancements* we're making. . . . *And that does impact our fourth quarter*, and that we still have some of those infrastructure investments that permeate through the fourth quarter as well.  And so that's why the guidance for the fourth quarter is consistent with the third."  Analyst expectations for 4Q2021 were thereafter revised downwards, centered around Playtika's implied 4Q2021 guidance of $636 million (where consensus for 4Q2021, before the 3Q2021 disclosure, was previously $685 million).[16]

130.   Indeed, Defendant Abrahams disclosed that the disappointing financial performance was a result of worse than expected performance in several games, and explained that the disappointing performance was a result of the "product and platform investment that will help our growth in the future [which] *resulted in comparatively fewer new product features for Slotomania and Bingo Blitz*."

131.   Given the inextricably intertwined relationship between product features and revenues, the reduced deployment of product features for *Slotomania* and *Bingo Blitz* – the two mobile games which collectively accounted for half of the Company's revenues – caused a significant decrease in revenues and caused downward financial guidance for 4Q2021.

### 1.   *Slotomania – A Complete Migration From C-Sharp to JavaScript*

132.   In discussing these disappointing results during the 3Q2021 Earnings Call, Defendant Abrahams disclosed that for *Slotomania* there were fewer product features developed because:

> [W]e also rewrote the client from the ground up, moving *Slotomania* from C Sharp to JavaScript. **This was the culmination of an 18-month project** that will allow us to develop features more quickly and efficiently and also gives us access to a wider pool of R&D talent.

---

[16] *See, e.g.*, BTIG, Clark Lampen and Jake Fuller, Analyst Report, November 3, 2021.

133.     Playtika thus admitted that as of November 3, 2021, there was an "18-month project" to "rewr[i]te" and migrate *Slotomania* from C-Sharp to JavaScript, which means that Playtika's *Slotomania* migration project was initiated ***prior to the IPO***.

134.     The context of this quote was made in relation to a project that was "culminati[ng]" in the quarter of 3Q2021 (where 3Q2021 was measured for the period ending September 30, 2021).  Thus, assuming that the "culmination" of the 18-month migration project occurred in July 2021 (i.e., the first month of 3Q2021), then the migration project would have commenced roughly January 2020, or a full ***year prior to the IPO***.

135.     Likewise, even assuming that the "culmination" of the 18-month migration project occurred on September 30, 2021 (i.e., the last day of 3Q2021), then the migration project would have commenced roughly around March 30, 2020, or a full ***9 months prior to the IPO***.

136.     Thus, at the time of the IPO and publication of the Registration Statement, the *Slotomania* project to migrate the programming language from C-Sharp to JavaScript was already underway and ongoing.

        **a.**      **The *Slotomania* Migration Placed at Risk the Ability to Generate and Timely Rollout Features and Content**

137.     As a threshold matter, Playtika itself asserted in the Registration Statement that "[o]ur technology infrastructure is ***critical*** to the performance of our games and to player satisfaction," and emphasized that "[t]oday, we are as much a ***technology company*** as we are a games and monetization company."  Thus, any changes to Playtika's games' technological infrastructure (i.e., the *Slotomania* migration project) would have a material impact on the ability to generate features.

138.     Indeed, Playtika touted in the Registration Statement that:

> ***Technology and data are at the core of our culture and drive our decision-making processes***. This focus underlies our goal of creating great gaming experiences for

our users. We process over nine terabytes of data daily. We prioritize and invest in developing our data science capabilities, which has helped us improve our operations and enhance our proprietary Playtika Boost Platform. With approximately 40% of our employees working in research and development, we believe that our highly skilled workforce is foundational to our success. Our obsession with data allows us to find the most effective ways to engage, monetize, and retain our users.

139.    Thus, since Playtika touted that it had an "obsession with data" and that its "technology and data . . . drive our decision-making processes," Playtika had reason to understand that a migration of this size for *Slotomania* – Playtika's most important and lucrative game – would have a material impact on the ability to rollout features and content.

140.    To that end, former employees of the Company explained that the migration would take long a time and would be "very complicated," and would pose major risks.  For example, CW-3, who worked in *Slotomania* prior to the IPO and worked on migrating *Slotomania* from web browsers onto social media platforms, confirmed that transitioning from a C-Sharp capability to JavaScript capability would have taken "at least a year," although CW-3 did not work on the project itself because he left *Slotomania*.

141.    CW-4 explained that a migration in a game's programming language was "very complex."

142.    CW-1 explained that the migration from C-Sharp to JavaScript for the *Slotomania* game would have been "very complicated."

143.    The "very complex" and "very complicated" nature of such a migration was further confirmed by Plaintiffs' software systems expert and industry literature on the subject.

144.    A "programming language is a vocabulary and set of grammatical rules for instructing a computer or computing device to perform specific tasks."[17]  In essence, companies

---

[17] Vangie Beal, *Programming Language*, WEBOPEDIA.COM, https://www.webopedia.com/definitions/programming-language/ (last updated Apr. 25, 2022).

pick a programming language and utilize that specific language to code and build their software, programs, apps, and platforms.

145.    C-Sharp was created by Microsoft and is a general-purpose programming language.[18] JavaScript refers to a different programming language, which was initially made for the purpose of adding interactive functionality and dynamic web content.[19]

146.    There are numerous important differences between the two programming languages.[20]

147.    As further explained by Plaintiffs' expert, while C-Sharp and JavaScript are both computer programming languages that are in wide adoption today, there are a number of distinct and significant differences between them.  Plaintiffs' expert explained that the first is the "syntax" between the two, which is starkly different and requires programmers to learn an entirely new way of performing operations, functions, and even organizing and architecting programs.  Plaintiffs' expert explained that the two languages also vary significantly in level of complexity, how error detections are handled, how programs are built and maintained and the platforms that they interact with.

148.    Thus, when a company wishes to migrate a mobile game's programming language from C-Sharp to JavaScript, it requires a multitude of steps and resources, and generates many risks to other aspects of game development.  As discussed in academic research, software

---

[18] Pluralist, *Everything you need to know about C#* (May 15, 2019), https://www.pluralsight.com/blog/software-development/everything-you-need-to-know-about-c-#:~:text=What%20Is%20C%23%3F,to%20an%20open%20source%20platform.

[19] Kinsta.com, *What Is JavaScript? A Look at the Web's Most Popular Scripting Language*, https://kinsta.com/knowledgebase/what-is-javascript/ (last updated Dec. 15, 2021).

[20] Peter Wayner, *JavaScript vs. other languages: Live long and prosper?*, TEACHBEACON.COM, #:~:text=JavaScript%20compared%20with%20C%23&text=C%23%20is%20statically%20typed %2C%20while,this%20functionality%2C%20one%20being%20Underscore (last visited May 2, 2022).

engineers performing language conversions "must be experts in both the source and target languages to realize the intricate differences between the language and the problems that can arise out of them."[21]

149.    As relevant here, the migration of *Slotomania*'s programming language placed at risk the ability for Playtika to timely rollout product features for *Slotomania* under this "constant cadence" that was touted to the market and users.

150.    **First**, *Slotomania*'s ability to rollout features and content on this regular cadence that Playtika touted was limited by the migration project because of the (i) cost, (ii) expense, (iii) resources, and (iv) time required for the migration – and there were only a set number of employees at the *Slotomania* studio.

(a)    CW-1 and CW-2 both explained that each game studio at Playtika worked separately and independently from each other, and that each studio had its own set of employees. CW-1 confirmed that *Slotomania*'s studio was operating independently from other game studios (e.g. *Bingo Blitz*), and CW-1 explained that there were only approximately 500 employees at the *Slotomania* studio near the time of the IPO.  CW-2 expressed that there was no real interaction between the studios unless they are seeking to implement product features across the games.

(b)    As explained by the magazine *Increment*, "cost and time lost in the transition are significant obstacles" to a migration, and "migrating is a labor-intensive and costly ordeal."[22]

(c)    If *Slotomania*'s studio wanted to retain engagement in the "constant" manner which was described while also conducting the migration – it had to balance the

---

[21] Johannes Martin and Hausi A. Muller, *C to Java Migration Experiences,* available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.9.2894&rep=rep1&type=pdf.
[22] David J. Lumb, *The ABCs of language migration*, Increment.com (April 2018), https://increment.com/programming-languages/language-migration/.

implementation of a new language while at the same time ensure that content and features are also being created, developed, and rolled out to users.

(d)     However, CW-1 further explained that the transition of *Slotomania* from C-Sharp to JavaScript was intended ***to save money*** and to ***<u>reduce headcount</u>***, since Playtika would no longer need multiple teams for multiple coding languages on multiple platforms.

(e)     The labor and cost intensive aspect of the migration would therefore be borne by the limited set of employees at the *Slotomania* studio, since the purpose of the migration was to reduce employee headcount and run operations more leanly.

(f)     This placed at risk the ability to generate and deploy product features in the same way and frequency as prior to the migration project, since operational resources are required for both independent projects (migrating the coding language vs. development of features and content).

151.   **<u>Second</u>**, the creation of features and content in the game were written in the new programming language that will be in use, which delays rollout of features because the developers of the features must therefore learn or orient to this new language.  Old features were also rewritten or "refactored" into the new language.

(a)     CW-4 described that *Caesar's Slots*, a different game at Playtika, also underwent a migration from C-Sharp to JavaScript.

(b)     CW-4 explained that when a migration of a programming language occurs, new features for the game would have to be written in the new programming language.

(c)     CW-4 further advised that each Playtika game was comprised of many small "components," each of which could be written in any coding language, and that those

42

components also had to be rewritten or "refactored" when a migration of the programming language occurred.

(d)     CW-4 described that as a result, and depending on the feature, feature developers struggled since they were tasked with rewriting something they couldn't understand and that lacked proper documentation.

(e)     Indeed, as explained and corroborated by the digital magazine *Increment,* a major and "significant obstacle[]" of performing a language migration was "retraining the workforce."[23]  "If engineers aren't already proficient in the new language, they may face a steep learning curve as they get up to speed,"[24] because "learning a new language is no small feat."[25]

(f)     This was corroborated by Plaintiffs' expert, who explained that the task of migrating a program from C-Sharp to JavaScript, even in a trial program that may consist of fewer than 100 lines of human written source code, often requires a user to completely rewrite the program from C-Sharp syntax to "an entirely new way of thinking with JavaScript."  The expert further explained that as the capabilities supported by both of these languages are myriad, the ways to properly and improperly implement a language migration are seemingly infinite. The expert explained: "when extrapolated to real world applications that may be hundreds of thousands of lines, if not millions, the task becomes extremely complex even for the most seasoned of development teams."

---

[23] David J. Lumb, *The ABCs of language migration*, INCREMENT.COM (April 2018), https://increment.com/programming-languages/language-migration/.
[24] *Id*.
[25] *Id*.

(g)     Thus, the ability to generate and rollout product features was necessarily limited by the *Slotomania* migration and the corresponding need to write the *Slotomania* features in a new code.

152.   **Third**, the *Slotomania* migration process itself inherently posed a myriad of risks given the surrounding circumstances of the game.

(a)     As a threshold matter, the "consensus is that rewrites can take a long time, and can open you up to new issues that the old code had solved long ago," and "migrating a product or project from one language to another can be a massive undertaking that entails a lot of risk."[26]  As a result, *Increment* thus recommends that companies ask themselves before a major migration about "alternatives" to a migration in order to prevent "exposing your company to the risk and expense."  Indeed, "[a] lot of the cost is ***external*** to the language itself. It's all sort of side effects."[27]

(b)     Further, as disclosed in the Registration Statement, *Slotomania* was "primarily accessed and operated through Apple, Facebook, and Google" and those third-parties also served as "significant online distribution platforms for [its] games."  Thus, the presence of these third parties raised the risk profile of the *Slotomania* migration project significantly.  As further explained by Plaintiffs' expert, modern applications, whether desktop or mobile based, interact with many third-party components.  These include, but are not limited to, third party Application Programming Interfaces ("APIs"), libraries, and runtime environments.  Plaintiffs' expert explained that when changing programming languages such as from that of C-Sharp to JavaScript, the use of various third-party APIs, libraries and related technologies must not only

---

[26] *Id.*
[27] *Id.* (emphasis added).

be migrated to new solutions, but integrated and tested.  Indeed, as explained, this is not something that is done upon completion of a migration "but must be planned for at the onset and tested and verified incrementally along the way."  This is often a "very substantial exercise" that "takes significant planning and resourcing and must be continually managed not only during the application development cycle, but also ongoing as the application is deployed."

(c)     In addition, in the case of *Slotomania*, the C-Sharp based application had been in existence for approximately 10 years prior to the start of the migration. *See supra* ¶69. Plaintiffs' expert explained the following: during this time, as is the case with any software application that has been deployed and has a significant user base, "technical debt" is accrued. These are things such as software bug fixes, patches, or workaround and features that have been incorporated over time and may be very nuanced.  When rewriting an application, in the case of migrating from C-Sharp to JavaScript, all of these fixes and features must be accounted for in the new migration to provide seamless transitions for customers and customer facing issues.  As is often the case over a 10-year timeline, the original developers that were responsible for these features, bug fixes and related workarounds, are no longer with the company.  New engineers must account for these items in migrating to the new language, dealing with poorly or non-documented source code and functionality.  This too takes a significant amount of engineering resources to facilitate a seamless migration to a new programming language, platform, and infrastructure.

(d)     Given these inherent risks that the act of migration produces, the ability to generate product features and content were also placed at risk.

153.    This risk materialized for *Slotomania* in 3Q2021, during the latter stages of the "18-month" migration project that Playtika had in place for the mobile game.  Playtika admitted

45

that it generated "***comparatively fewer new product features for Slotomania***" in the quarter, because it "rewrote the client from the ground up, moving *Slotomania* from C Sharp to JavaScript." The decreased frequency of product feature deployment was naturally a consequence of the inherent processes and resources that are required when implementing a "complicated" migration.

154. As a result of all the above, Defendants are therefore strictly liable (or negligent) in failing to disclose in the Registration Statement that Playtika was already in the process of materially changing the infrastructure of *Slotomania*, which placed at risk—and did have a negative effect on—the ability to rollout features on this "constant cadence" that Playtika touted to investors.

2.      ***Bingo Blitz* – A "Complete Brand Face Lift" and "Total Revamping" of the User Interface Because the Game was "Outdated"**

155. In the 3Q2021 Earnings Call, Defendant Abrahams also disclosed that for *Bingo Blitz* there were fewer product features developed because of "product and platform investments for . . . *Bingo Blitz*." More specifically, Defendant Abrahams explained:

> Another strategic initiative in the quarter included a **total revamping of the *Bingo* engine**, the first step in preparing *Bingo Blitz* for the next decade. Looking ahead, we're working on a **complete brand face lift**, **including refreshing the lobby, map, logo, payment page and many other aspects of the game**.

156. CW-1 confirmed that this "strategic initiative" announced by Playtika referred to the "User Interface" ("UI") aspect of the mobile game. As explained by CW-1, the term "User Interface" refers to the visual side of the mobile app and deals with the users' interaction with certain visual aspects of the game.

157. For example, the positioning and functionality of the buttons of a game, or the logo of the game, or the payment page of the game, are all considered aspects of that game's "User Interface."

158.    Importantly, CW-1 confirmed that Playtika actually began implementing these long-term User Interface projects for *Bingo Blitz* sometime in "February or March of 2021."

159.    CW-1 further explained that implementation of the User Interface projects was merely the ***final step*** of the roll-out phase of the User Interface projects.

160.    CW-1 explained that there was a "design phase" of the User Interface projects, and the "design" phase of these User Interface projects would have ***necessarily begun*** "***months***" prior to February or March of 2021, because the "***art comes before implementation.***"

161.    CW-1 stated that the artists and design team would have to develop the pictures and design before those same pictures and design were handed off to the UI team.  CW-1 explained that after this "design phase" that the artists and design team would then send the pictures to the UI team for implementation.

162.    Playtika had a plan in place to implement these User Interface projects ***before or at the time the IPO occurred on January 15, 2021***.

163.    CW-1 also explained that the "*Bingo* engine" referred to the "backend" and that the "engine" referred to everything behind the scenes and the components that were driving the app on the backend.  CW-4 stated similarly that the "engine" of a game refers to "something that has to do with what is ***behind the User Interface***."

164.    Thus, when Playtika was referencing a "total revamping of the *Bingo* engine," it was referring to something that occurred at the "backend" of the mobile application that relates to the User Interface.

165.    The "backend" of an app (*e.g. Bingo Blitz*) "is also known as the server-side of a website or application. It organizes and stores data, as well as ensuring that everything on the client side of the website functions properly. While the backend doesn't interact with users

directly, it plays an indispensable role behind the scenes by adding key functionality to a site. Without a clean and proper backend, the frontend won't work properly [i.e., the aspects of the app that you see on the screen]. So, even though you don't directly interact with the backend as you do with the frontend, you are indirectly in contact with all the processes that happen on the backend. The backend includes activities such as writing APIs, creating libraries, and working with system components without user interfaces. The core functionality of web apps is usually managed by the backend. For example, if you want to purchase something from an online store, the backend manages the actual money transactions when going through the checkout process. While the frontend makes sure the 'checkout'-button is positioned properly on the page and sends you to the next page, the backend interacts with services outside of your own app or website, such as your bank app or PayPal. You don't see the entire process of this transaction happening, as it all happens behind the scenes, in the backend. . . . . For example, you want to pay for your online order by clicking on one of the payment options on the checkout page.  You click on, for example, the PayPal option, and by clicking on that button, the frontend sends a request to the backend to connect with PayPal.  Through an API, the backend connects with the external service of PayPal, and sends back the PayPal login screen to the frontend, where the user can fill in his/her credentials."[28]

166.    As admitted by Playtika, the User Interface projects would therefore include a "total revamping" of certain components or aspects of the *Bingo Blitz* backend, since Playtika asserted there was a "total revamping of the *Bingo* engine." *See supra* ¶155.

167.    CW-1 further explained that the reason for implementing the User Interface projects was because the game design of *Bingo Blitz* was "outdated" and there was a balancing

---

[28] What Are Frontend and Backend in App Development?, LIZARD.GLOBAL (Sept. 30, 2021), https://lizard.global/blog/what-are-frontend-and-backend-in-app-development.

act within the Company to acquire more and younger users, while retaining legacy, older users who have become accustomed to the *Bingo Blitz* design.

168.    CW-1 explained that the user base for Playtika's core games was largely female users who are at least 45 years old.  CW-1 explained that Playtika needed to attract a younger audience by redesigning some of its older games with a new User Interface.  CW-1 explained that the reason for this was because older users would "die" out, and naturally would then stop playing.  CW-1 advised that in order to prevent this "crystallization" of the older audience of the user base for the games, Playtika had three options: (1) make a redesign of existing legacy games, (2) acquire new games, or (3) launch completely new titles.  CW-1 advised that as to the third option, there was limited to "no success."  CW-1 advised that as to the second option, some of it was successful, and some of it was not.  CW-1 explained that the two redesigns for *Slotomania* and *Bingo Blitz* were therefore done to prevent the "crystallization" of its user base and to attract a younger audience.

> a.    The *Bingo Blitz* User Interface Projects Placed at Risk the Ability to Generate and Timely Rollout Features and Content

169.    As a threshold matter, CW-1 explained that the redesign of *Bingo Blitz* would have caused the feature deployment roadmap to decrease between "5% and 10%," and stated that "***that was the plan.***"

170.    That "the plan" was a 5% to 10% reduction in product feature rollouts therefore meant that the ***risks*** to the "constant cadence" of product feature rollouts was ***substantially*** greater than that.  It is a truism that projects of this scale *seldom* go to plan and that at the very least, the planned for reductions from such a project necessarily do not perfectly correspond to the risks posed by such a project.

171.    Indeed, similar to the infrastructure change for *Slotomania* discussed above (*supra* ¶¶132-154), the User Interface Projects placed at material risk the ability to generate product features in the "constant cadence" manner in which Playtika touted.

172.    As one online publication devoted to UI topics described it, "***the risks of doing a full [UI] design overhaul will touch on every aspect of the business*** – from sales and customer support to engineering and PR."[29]

173.    More specifically, doing a major overhaul of the *Bingo Blitz* User Interface (and the corresponding "total revamping" of the "*Bingo* engine" and backend) would place at risk the ability to develop game features and content at a "constant cadence" for the following reasons:

174.    **First**, CW-1 stated that there were approximately 400 people working at *Bingo Blitz*. CW-1 then explained that there was a "limited capacity of developers" at *Bingo Blitz* and that "naturally," if you have 300 to 400 people at the studio, you can't produce the same number of features as before and also do a UI redesign.

175.    **Second**, CW-1 also explained that features must be "matched" with the User Interface. CW-1 further explained that the UI redesign needs "A/B testing"[30], and is "complicated in terms of analytics."

(a)    With respect to the testing required, CW-1 explained that the rollout process of the new User Interface projects requires time and testing, as Playtika cannot rollout all the new design of the mobile game at once. Instead, Playtika changes a small piece of the

---

[29] Michal Mazur, *The true cost of a redesign*, UXDESIGN.CC (June 22, 2021), https://uxdesign.cc/the-true-cost-of-a-redesign-a52c67c5bbbd (emphasis added).

[30] A/B testing broadly refers to piloting different versions of a product on different users and assessing their reaction (either articulated feedback or data about their behavior) to make design decisions.

mobile game screen and then gets "feedback" from a small population of users, before implementing the next piece of the project.

(b)     CW-1 utilized a "2%" of the user base as an example – Playtika would test the UI project on 2% of the population of *Bingo Blitz* users, then receive feedback, before increasing to a larger percentage of the population for testing.  CW-1 explained that sometimes, Playtika would receive negative feedback.

(c)     CW-2 corroborated this process.  CW-2, a UI/UX designer, explained that a UI project would have to be initially tested internally by Playtika employees before being released to a small percentage of players in focus groups.  CW-2 explained that the visual project would eventually be released to 100% of users, but that the UI project would first be released by percentages.

(d)     Further, CW-1 stated that UI development at *Bingo Blitz* operated on a separate path from in-game product feature development.  According to CW-1, the UI projects were handled by a different team than in-game product feature development, to which CW-1 elaborated that there were "specific" employees working on the UI projects.

(e)     Thus, given the potential for delay and negative feedback in the User Interface projects, and that features in the game must be "matched" with the User Interface, there was risk of delay to product feature rollout as well.

176.    **Third**, the User Interface projects posed inherent risks to retention of *Bingo Blitz* users, and therefore development of features targeted towards those users.

(a)     Large overhauls of an app's user interface are notoriously prone to cause users to leave.  Indeed, companies know that "major changes might upset their existing users. 'Not only would a redesign cost me a small fortune,' one executive [stated], 'but look at the

backlash against Google and Facebook's changes.  I'm not willing to risk losing customers over

design.' . . . Indeed, Google, Twitter, and Facebook caused quite a stir recently by making

dramatic changes to their UIs. In less than 24 hours, hundreds of users formed a coalition against

the new Gmail, with a mission to 'urge Google to fix the horrid new Gmail interface and take us

back to productivity.' And Facebook users began posting 'If it Ain't Broke, Don't Fix It' banners

to express their dissatisfaction."[31]

> (b)     Given this risk of users (and particularly older users leaving), there was

also a risk in the development and deployment of features because certain features were

contingent on Playtika "analyzing individual gameplay and designing game experiences suited to

user preferences" as touted in the Registration Statement.  The fewer users the game has, the less

Playtika will be able to develop such user-specific features and content.

177.    The risks to the development of product features for *Bingo Blitz* materialized in

3Q2021, as Playtika admitted that the User Interface projects, and the corresponding total

"revamping" of the "*Bingo* engine," which was the first step in a "complete brand face lift,"

"resulted in comparatively fewer new product features for . . . *Bingo Blitz*."

178.    As a result of all the above, Defendants are therefore strictly liable (or negligent)

in failing to disclose in the Registration Statement that Playtika already had a plan in place to

change the infrastructure of *Bingo Blitz*, which materially placed at risk—and did have a

negative effect on—the ability to rollout features on this "constant cadence" that Playtika touted

to investors.

---

[31] Scott Plewes, *Overhauling a UI Without Upsetting Current Users*, UXMAG.COM (July 5, 2012), https://uxmag.com/articles/overhauling-a-ui-without-upsetting-current-users.

**F.      Defendants' Materially False and Misleading Statements and Omissions**[32]

179.     At the time of the IPO, Playtika was already in the process of implementing material fundamental infrastructure changes to (i) *Slotomania* – by migrating and changing the mobile game's programming language from C-Sharp to JavaScript, and (ii) *Bingo Blitz* – by having a design and plan in place to implement a major overhaul to the User Interface for the mobile game which included a "total revamping of the *Bingo* engine" and a complete "brand face lift."  In light of the totality of Defendants' statements in the Registration Statement, and viewed in context, the failure to disclose these two ongoing infrastructure changes to the two most important and profitable games to the Company's business rendered the Registration Statement materially false and misleading.

180.     Section 11 creates liability against each of the Defendants for each (1) misrepresentation, (2) omission in contravention of an affirmative legal disclosure obligation, and (3) omission of information that is necessary to prevent existing disclosures from being misleading, in the Registration Statement.

181.     Pursuant to SEC Regulation C, the Registration Statement was required to disclose material information necessary to ensure that representations in the Registration Statement were not misleading.  Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

182.     Further, Form S-1 also requires that the Registration Statement furnish the information called for under Item 503(c) of Regulation S-K, 17 C.F.R. § 229.503(c), including

---

[32] In this section, the false or misleading aspects of the statement(s) are bolded and italicized.

among other things, a discussion of the most significant factors that make the Offering speculative or risky.  Effective May 2, 2019, and without any substantive changes, the SEC relocated Item 503(c) to Item 105, 17 C.F.R. § 229.105.

183.    The Registration Statement was negligently prepared, and as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing its preparation.

### 1.    Statements Concerning Playtika's "Constant Cadence" of Product "Features"

184.    The Registration Statement asserted that:

(a)    "Throughout the lifecycle of our games, we dedicate substantial operational resources and team members to support a ***constant cadence of novel content and feature creation that drives conversion and continued monetization***."

(b)    "We take a fundamentally different approach to operating games. In our industry, games are often viewed as having finite lifespans. When introduced, they leverage fresh content to start strong, and then fade over time as users become familiar. We take the opposite position, and instead seek to operate our games as platforms that users can interact with for decades. To achieve this longevity, ***we provide a constant flow of new content that is highly personalized to users based on their gameplay behavior***."

(c)    "Our revenue growth has been driven by improving the content, offers, and features in our existing games and the release or acquisition of new games. In order to enhance the content, offers, and features in our existing games and to develop or acquire new games, ***we must invest a significant amount of our technological and creative resources, ensuring that we support a consistent cadence of novel content creation that drives conversion***

54

*and continued monetization*. These expenditures generally occur months in advance of the release of new content or the launch or acquisition of a new game."

(d)     "*We are experts at creating features and player experiences that optimize player engagement, resulting in increased conversion and monetization*.  *We are focused on continuing to implement and enhance features that keep games fresh and increase user engagement, including awarding in-game virtual items, providing engaging new game themes, motifs, challenges and in-game missions, as well as in-game chat and messaging capabilities*. We serve these features to our users based on their preferences and the optimal timing during each player's gameplay."

(e)     "*Throughout the lifecycle of our games*, *we dedicate substantial operational resources and team members to support a constant cadence of novel content and feature creation that drives conversion and continued monetization*.  Five of our games currently rank as the #1 grossing game in their respective genre worldwide, based on total in-app purchases on iOS App Store and Google Play Store worldwide for the nine months ended September 30, 2020, according to App Annie."

(f)     "We aim to increase our monetization of users primarily through increasing the degree of engagement our users have with our games.  Leveraging our live operations expertise to build games that are engaging and monetizable, we seek to generate increased value *on a per player basis by continuously optimizing our content to drive user engagement and retention*."

(g)     "*By delivering content, offers, and features to users at the right times during their gameplay, we drive paying user conversion, continued monetization, and long-term paying user retention.*  For example, we have grown revenues for our first and largest title,

55

*Slotomania*, at a 35% compound annual growth rate between the years ended December 31, 2011 and December 31, 2019, with 89% of revenues for the year ended December 31, 2019 for *Slotomania* coming from users who downloaded or first played the game in 2017 or earlier."

(h)     "In addition, with 35.2 million average MAUs for the nine months ended September 30, 2020, we are able to use our scale to gain significant insight into the operations of our games and refine ***and implement effective strategies with respect to feature innovation, content cadence***, loyalty rewards, game economies, and player segmentation."

(i)     "Our players love our games because they are fun, creative, engaging, and ***kept fresh through a steady release of new features*** that are customized for different player segments. As a result, we have steadily increased our user base and paying users, and have retained users over long periods of time."

(j)     "By leveraging this platform, our ***game studios can dedicate a greater portion of their time to creating innovative content, features***, ***and experiences for players***."

(k)     "The most successful free-to-play games ***require the consistent introduction of new content, offers, and features***[.]"

(l)     "***We frequently introduce new features***, ***offers, and content***, ***including quests, rewards, challenges, player vs. player competitions, customizations, and promotions that enhance the overall player experience***."

(m)     "Future growth in players and engagement will depend on our ability to retain current players, attract new players, acquire or ***launch new games and features***, and expand into new markets and distribution platforms."

(n)     "For example, for the year ended December 31, 2018 and 2019, our top two games by revenue, *Slotomania* and *Bingo Blitz* collectively generated more than half of our

revenues for each period. For a game to remain popular and to retain players, *we must constantly enhance, expand and upgrade the game with new features, offers, and content that players find attractive*."

(o)     "Revenues for the nine months ended September 30, 2020 increased by $398.6 million when compared with the same period of 2019. *The increase in revenues was primarily due* to the acquisitions of *Supertreat* in January 2019 and *Seriously* in July 2019 contributing an aggregate $152.0 million of incremental revenues compared to the nine months ended September 30, 2019, *combined with our ongoing improvements to monetization, new content and product features and increased engagement across our broader portfolio of games*, including as a result of stay-at-home orders during the global COVID-19 pandemic. The *combination of these factors—acquisitions, improvements to monetization, new content and product features and the increased engagement*—drove an increase in both DAUs and DPUs, resulting in the overall increase to payer conversion."

(p)     "Revenues for the year ended December 31, 2019 increased by $396.9 million when compared to 2018. *The increase in revenues was primarily due* to the acquisitions of *Wooga* in November 2018, *Supertreat* in January 2019 and *Seriously* in July 2019, contributing an aggregate $240.5 million of incremental revenues compared to the year ended December 31, 2018, *combined with improved monetization and increased revenues from new content and product features across our broader portfolio of games when compared to 2018.* The combination of the acquisitions *and improvements to monetization, new content and product features drove an increase in both DAUs and DPUs*."

(q)     "Revenues for the year ended December 31, 2018 increased by $339.9 million when compared to 2017. The *increase in revenues was primarily due* to the incremental

revenues of $57.3 million related to the acquisitions of *Jelly Button* in October 2017 and *Wooga* in November 2018 compared to the year ended December 31, 2017, **combined with improved monetization and increased revenues from new content and product features across our broader portfolio of games when compared to 2017**. The combination of these acquisitions **and improvements to monetization, new content and product features drove an increase in both DAUs and DPUs, resulting in the overall increase to payer conversion**."

(r)     "We consistently generate new data and insights that we use to improve how we manage our games. Through our dedication to **providing new content, feature optimization and customization**, we have increased average Daily Payer Conversion from 2.1% for the nine months ended September 30, 2019 to 2.5% for the nine months ended September 30, 2020, an increase of 19.0%. **We intend to continue to explore new strategies to improve our conversion of users into paying users, including continued game enhancements** and data-drive user management strategies."

(s)     "Our research and design team has extensive expertise in creating new content and gameplay features as well as proprietary tools and systems to enable the efficient design, development and implementation of new content and features. For example, we have recently automated certain quality assurance procedures for many of our games, **which significantly increased the frequency with which we are able to deploy new content and features for those games, allowing us to create and deploy more content quicker to enhance monetization**. We invest heavily in R&D, and approximately 40% of our employees are employed in research and development, **which enables us to consistently introduce updates and enhancements to our games on a daily, sometimes hourly, basis.**"

(t)      "***Through frequent content and feature updates***, and our technology-driven live operations capabilities, our games provide highly tailored experiences to users.  ***By serving content, offers, and features to users at the right times during their playing cycle, we are able to achieve impressive monetization and retention outcomes.***  The chart below illustrates revenues generated by each cohort over the periods presented with respect to ***Slotomania***, *Caesar Slots*, ***Bingo Blitz***, . . . ."

185.     The statements in ¶184 were false and misleading statements of material fact when made because of the statements above, when viewed collectively and in context, created the misleading impression that there were no undisclosed material risks to Playtika's ability to continue rolling out product features on a "constant cadence."  This was the misleading impression that existed because:

(a)      Playtika specifically touted this ability to rollout product features on a "constant flow" and "constant cadence" under multiple sections of the Registration Statement including "**How We Are Different**" and "**Our Core Strengths**," and therefore touted that this "constant flow" and "constant cadence" was a strong reason for why investors should buy into the IPO;

(b)      Playtika repeatedly emphasized that product features were vital to user engagement and monetization and that "[f]or a game to remain popular and to retain players, ***we must constantly*** enhance, expand and upgrade the game with new features, offers, and content that players find attractive," indicating that a constant flow and rollout of features was not simply "optional," or "helpful," but necessary for retention of users and thus the Company's revenues;

(c)     Playtika emphasized that the success of its business model depends on a constant rollout of features – as, "[t]he most successful free-to-play games require the ***consistent*** introduction of new content, offers, and features";

(d)     Playtika chose to describe the process of the rollout of features as one that was—and would be—done not just under a "cadence," but a "***constant*** cadence."  When combined together as one phrase, a "constant cadence" or "consistent cadence" carries with it a meaning that there will be a steady undisturbed frequency to the roll-out of product features that will occur;

(e)     Playtika confirmed and corroborated that notion and understanding by assuring investors that the features are deployed, and would be deployed, "***frequently***," and "***consistently***," and even on a "***daily, sometimes hourly, basis***";

(f)     Playtika not only made these assertions, but also promised that it would be investing resources to be able to continue on this path of developing features and content on this "constant cadence," including by (1) dedicating "substantial operational resources and team members to support a constant cadence of novel content creation," (2) leveraging its other platforms so that "our game studios can dedicate a greater portion of their time to creating innovative content, features, and experiences for players," and (3) utilizing as an example its "recently automated certain quality assurance procedures for many of our games, which significantly increased the frequency with which we are able to deploy new content and features for those games, allowing us to create and deploy more content quicker to enhance monetization";

(g)     Playtika also specifically tied product features to an increase in DAUs and DPUs for the years 2018, 2019, and 2020, and asserted that its revenues and monetization were

driven by "***new content and product features across our broader portfolio of games***" which "drove an increase in both DAUs and DPUs" – further indicating the importance and causal relationship between the frequent rollout of product features to the Company's financials;

(h)   Playtika promised that "[w]e are ***focused*** on ***continuing*** to implement and enhance features that keep games fresh and increase user engagement," indicating that the Company was "focused" on proceeding with this necessary "constant flow" in the future;

(i)   Playtika repeatedly touted that the constant flow of content and features to these users was Playtika's expertise, and that Playtika was primarily a "technology company," that it was obsessed with "data," that the underlying technology and data were what drove decisions at the Company, and that it viewed each of its games as "platforms" to interact with users;

(j)   Playtika did not tout the importance of this "constant cadence" of product feature development only once – it ***repeatedly*** made these assertions throughout the Registration Statement;

(k)   In addition, 97% to 98% of the Company's revenues were derived from in-app purchases in Playtika's games, meaning that the Company did not have a diversified revenue stream and was entirely dependent on users purchasing in-app items, and thus, user engagement was particularly essential for this business;

(l)   Further, only 2-3% of users actually contributed to revenues in this manner, with the majority of users simply playing the game for free, which significantly raises the importance of maintaining the personalized engagement of these paying users on a "constant" and "consistent" manner, as losing paying users would have a material impact on revenues;

61

(m)     And the primary method in which consistent in-app purchases was (and is) achieved is through a "constant cadence" of product features and content – which meant that failure to continue on such a "constant cadence" of product features would lead to decreased revenues;

(n)     Notably, this was especially so for *Slotomania* and *Bingo Blitz*, the Company's two leading games which accounted for **half** of the Company's **billions** of dollars in revenues;

(o)     And in addition, on the day of the IPO, Defendant Antokol as CEO of the Company assured investors through CNBC that Playtika differed from other casual social gaming companies in the industry because Playtika viewed itself as a "technology company" that looked at its games as a "platform" to interact with players.  Thus, Playtika stated that its mobile games, like *Slotomania*, would be getting "***fresh content every week***" or "***every two weeks***."  This differentiating "philosophy" was also explicitly spelled out and confirmed in the Registration Statement;

(p)     In light of all of the above, Plaintiffs and the Class would have believed that any material risks to Playtika's ability to continue on a "constant cadence" of rolling out product features would have surely been disclosed in the Registration Statement;

186.     However, in fact, there were significant material risks to Playtika's ability to roll out product features on this "constant cadence" at the time of the IPO, which were produced by: (i) *Slotomania's* infrastructure change from C-Sharp to JavaScript; and (ii) the *Bingo Blitz* User Interface Projects, a self-described "complete brand face lift" that required a "total revamping of the Bingo engine."  Both infrastructure projects went undisclosed in the Registration Statement.

2.      **The Registration Statement Failed to Disclose and Misrepresented Significant Risks**

187.    Item 105 (17 C.F.R. § 229.105) requires that under the caption "Risk Factors," there be, in plain English, a "discussion of the material factors that make an investment in the registrant or offering speculative or risky."

188.    The Registration Statement, under this duty imposed by Item 105, failed to disclose that the two infrastructure changes to *Slotomania* and *Bingo Blitz*, as alleged above, were both "material factors" that made the IPO "speculative or risky."  Indeed, nowhere in the Registration Statement was there a discussion of the two infrastructure changes to Playtika's leading mobile games, despite the fact that (a) these changes would likely have a material impact on Playtika's revenues, and (b) these infrastructure changes presented and were likely to cause disruption to Playtika's loyal users and there was a substantial likelihood that they would lead to a long-term decline in spending by Playtika's cohorts of loyal paying users.  In addition, the Registration Statement, under this duty imposed by Item 105, failed to disclose the risks posed by the underlying conditions requiring or prompting Playtika to undergo these two infrastructure changes to *Slotomania* and *Bingo Blitz*, including that (a) the code-base for their two most profitable games was outdated and in need of revamping, and (b) that Playtika needed to implement these substantial infrastructure changes in order to position itself to acquire new and younger customers because of concerns that the "crystallization" of there existing consumer base could lead to a decline in long term revenue.

189.    In addition to failing to disclose risks in violation of Item 105, the Registration Statement was misleading and deficient because the risks that it did provide were inaccurately described as ***potential*** risks, which "could" or "may" have an adverse effect on its business,

financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested.

190.    The Registration Statement stated, in pertinent part, that:

Our success depends upon our ability to attract and retain players, which is largely driven by maintaining and increasing the quality and content of our games. To satisfy players, we need to continue to improve their experience and innovate and introduce games that players find useful and that cause them to return to our suite of games more frequently. ***This includes continuing to improve our technology to tailor our game offerings to the preferences and requirements of additional geographic and market segments, and adapt to the release of new devices and platforms and to improve the user friendliness and overall availability of our games, all of which can be costly and generate risk***. Our ability to anticipate or respond to changing technology and evolving industry standards and to develop and introduce improvements and enhancements to games on a timely basis is a significant factor affecting our ability to remain competitive, expand and attract new players and retain existing players. We cannot assure you that we will achieve the necessary technological advances or have the financial or other resources needed to introduce new games or improvements and enhancements to games on a timely basis or at all. In addition, our ability to increase the number of players of our games will depend on continued player adoption of such games. Accordingly, our failure to develop or adjust to changes in technology, platforms, devices and operating models and evolving industry standards could adversely impact our business. ***Even where we are able to successfully adapt to changing technology, platforms, devices and operating models and evolving industry standards, we may require substantial expenditures to do so, which could adversely impact our business, financial condition and results of operations***.

191.    Further, the Registration Statement inaccurately described as ***potential***, certain risks associated with Playtika's "General Risks" which "could" or "may" have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Registration Statement stated, in pertinent part, that "***Following this offering, the market price of our common stock may be highly volatile and may fluctuate or decline substantially as a result of a variety of factors, some of which are beyond our control or are related in complex ways, including . . . programming errors or other problems associated with our products***."

192.     The statements referenced in ¶¶190-191 were inaccurate statements of material fact because while noting only the ***potential*** negative impacts on its business, financial condition, and results of operations, the Registration Statement failed to disclose and misrepresented the following significant, ***then existing*** material event and adverse trend or uncertainty that Playtika had ***already been facing*** at the time of the IPO:

(a)     At time of the IPO, (i) *Slotomania*'s migration in the programming language from C-Sharp to JavaScript was already underway, and (ii) the Company had a plan in place to implement a complete User Interface overhaul for *Bingo Blitz*, including a total revamping of the *Bingo* engine and corresponding backend components to the UI.

(b)     These two major technology infrastructure changes to Playtika's two most profitable games collectively accounted for half of the Company's revenues, and were projects that were ***already in place*** at the time of the IPO.

(c)     Specifically with regard to ¶190,  the statement was misleading by omission because while acknowledging that changes to "improve our technology . . . and adapt[ing] to the release of new devices and platforms and to improve the user friendliness and overall availability of our games" "can be costly and generate risk," Playtika did not disclose that at the time the statement was made there were already plans to materially change or "improve" the technology to both *Slotomania* and *Bingo Blitz*.

(d)     Specifically with regard to ¶191,  the statement was misleading by omission because while acknowledging that "programming errors or other problems associated with our products" can affect the market price of Playtika stock, Playtika failed to disclose that it was already making fundamental infrastructure change to *Slotomania*'s programming language and *Bingo Blitz's* User Interface and the corresponding backend "*Bingo* engine," which should

have been disclosed at the time of the IPO given these projects' potential to cause "problems associated with our products."  Indeed, the "problems associated with our products" phrase could reasonably have been read by investors to include the risk involved with programming changes to the games, as Playtika utilized "programming errors" as a type of "problem[] associated with our products."

> G.  **Events Following the IPO**

193.    On November 3, 2021, three quarters after going public, Playtika disclosed its financial results for the period ended September 30, 2021.

194.     Playtika disclosed actual revenues of $636 million for the quarter, a decrease from $659.2 million from the prior quarter,[33] and missing analyst consensus of $664 million.  As a result, Playtika revised its full year revenue guidance downward to $2.57 billion (down from $2.6 billion) and revised its full year adjusted EBITDA guidance downward to $980 million (down from $1 billion).

195.    Defendant Abrahams confirmed in Playtika's 3Q2021 Earnings Call that "actual Q3 results were down 3.6% sequentially.  While there were many areas of success within the quarter, a few of which [Defendant] Robert [Antokol] highlighted, there were also a few areas that impacted our results."

196.    Playtika disclosed that the reason for the disappointing financial results were as follows:

> First, we had lower-than-expected revenues for both Board Kings and World Series of Poker. Starting with Board Kings, we've made recent management changes, which we believe will set the business back to growth. We are also encouraged that the upcoming World Series of Poker Main Event, in collaboration with the World Series of Poker land-based tournaments and upcoming product road map, will spur growth in our WSOP game. ***In addition, product and platform investments that***

---

[33] *See* Playtika, 2Q2021 Form 10-Q at 2.

**will help our growth in the future resulted in comparatively fewer new product features for *Slotomania* and *Bingo Blitz*.**

197.   With respect to *Slotomania*, Playtika disclosed in the same Earnings Call that one

of the long-term product and platform investments was the migration in *Slotomania*:

> Turning to our casino theme portfolio. Revenues were down 4% year-over-year. We were highly focused on developing several campaigns, both for product and marketing. . . . ***Additionally, we also rewrote the client from the ground up, moving Slotomania from C Sharp to JavaScript. This was the culmination of an 18-month project*** that will allow us to develop features more quickly and efficiently and also gives us access to a wider pool of R&D talent.

198.   And as to *Bingo Blitz*, Playtika disclosed in the same Earnings Call that:

> Another strategic initiative in the quarter included a ***total revamping of the Bingo engine, the first step in preparing Bingo Blitz for the next decade.  Looking ahead, we're working on a complete brand face lift, including refreshing the lobby, map, logo, payment page and many other aspects of the game.***

199.   Playtika thus disclosed that there were "product and platform investments" in

place which resulted in the Company developing fewer product features for both *Slotomania* and

*Bingo Blitz*.  This was inconsistent with the affirmations in the Registration Statement that

Playtika would develop and deploy product features "consistently," under a "constant cadence"

and "constant flow."

200.   Indeed, the lack of product features in *Slotomania* and *Bingo Blitz* was fully felt

by the user base, as the long-term infrastructure changes produced fewer features and less

engagement during 3Q2021.  As one user exclaimed about *Slotomania* on August 27, 2021 – the

game "worked perfectly fine for 2 months. Now it CONSTANTLY disconnects.":



201.    And another player in *Bingo Blitz* lamented on September 2021: "This game is getting worse! I have been playing this game since October 2012, and ***over the past 6 months*** I have never been so annoyed about playing a game as this one . . .  I used to love playing this game! But maybe it's time to find another bingo game I can play and be happy!"



202.    In addition to the Earnings Call, the press release associated with the 3Q2021 Earnings Call also disclosed the long-term infrastructure plans, stating in generalized terms: "'[t]he third quarter presented opportunities for us to make product investments and set the stage for growth in 2022 and beyond,' said Robert Antokol, Playtika Co-Founder, Chief Executive

Officer, and Chairman. . . . 'We are confident that the infrastructure and product investments made in Q3'21 will allow us to drive sequential growth across our portfolio into 2022,' said Craig Abrahams, President and Chief Financial Officer.'"

203.    Investors were nevertheless concerned. The first question in the Earnings Call Q&A was about the long-term infrastructure plans that was disclosed to investors in the press release. In response to analyst concerns, Defendant Abrahams said that "[i]n terms of the broader portfolio, we guided the back half of the year to be flat because we saw comparatively fewer new promotions and features as a result of some of the infrastructure enhancements we're making. . . . And that does impact our fourth quarter, and that we still have some of those infrastructure investments that permeate through the fourth quarter as well."

204.    And in response to another analyst question about engagement, Defendant Abrahams asserted that "Yes, in terms of player engagement, I think what we saw in the quarter was that in games where we had investment in infrastructure and technological changes or we had fewer comparative features and releases, you would have seen engagement levels down in terms of player engagement."

205.    As a result, and on this news, the Company experienced the "the wipeout of nearly one-fourth of the company's equity value"[34] and a 23.3% drop in share price on a single day, falling $6.80 per share to close at $22.72 per share on November 3, 2021.

206.    MKM Partners specifically addressed *Slotomania* and *Bingo Blitz* investments in their report, stating that "*Slotomania* . . . Game code is being switched from C# to Java Script, in order to allow for the quicker development of game features," and "*Bingo Blitz* – The game engine is being completely revamped as it is one of the company's oldest games and in need of a

---

[34] Wedbush Securities, The Wedbush View: *Down But Not Out; PT to $35,* Nov. 4, 2021, at 2.

refresh.  A facelift will include improvements to the lobby, the map, the logo, and the payments page.  An enhanced social experience is also being developed."[35]  MKM Partners announced that it will increase operating expense growth expectations, "which not only takes into account the low margin addition of Reworks acquisition but also higher R&D spending for planned infrastructure investments."[36]

207.    Wedbush Securities succinctly commented that as a result of the revenue falling below the "Street's expectations," and the "wipeout of nearly one-fourth of the company's equity value," "[l]ooking ahead, it may take several months before investors are willing to override their fears of unexpected misses and ultimately reassert their trust in management."[37]

## V.    CLASS ACTION ALLEGATIONS

208.    Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired Playtika common stock pursuant and/or traceable to Playtika's January 2021 IPO and who were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Playtika during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Playtika's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

---

[35] MKM Partners, *The Roadmap Remains Attractive In The Face Of Near-Term Headwinds And Investments,* Nov. 4, 2021, at 2.
[36] *Id.*
[37] Wedbush Securities, The Wedbush View: *Down But Not Out; PT to $35,* Nov. 4, 2021, at 2.

209.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Playtika or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

210.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

211.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

212.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

213.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

71

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT I: Violation of Section 11 of the Securities Act Against Defendant Playtika, the Individual Defendants, and the Underwriter Defendants

214.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

215.    This Count is asserted pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendant Playtika, each of the Individual Defendants, and each of the Underwriter Defendants.

216.    This cause of action does not sound in fraud. Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This claim is based solely on negligence and/or strict liability. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

217.    The Registration Statement issued in connection with the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted material facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein. Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

218.     Playtika is the registrant for the IPO.  As such, Playtika is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.  By virtue of the Registration Statement containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading.  Playtika is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

219.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of material facts and were not misleading.

220.     The Individual Defendants each signed the Registration Statement and caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading.  By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading.  As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

221.     Each of the Underwriter Defendants, as an underwriter of the securities offered in the IPO pursuant to the Registration Statement, had a duty to ensure to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements

misleading.  By virtue of each of the Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading.  As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

222.    None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the Registration Statement did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

223.    By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

224.    Plaintiffs and the Class have sustained damages.  The value of Playtika common stock has declined substantially subsequent to and due to violations by Defendants named in this Count.

225.    At the time of their purchases of Playtika common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonable discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action.  Less than three years has elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time Plaintiffs commenced this action.

**COUNT II: Violation of Section 15 of the Securities Act Against the Individual Defendants**

226.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

227.     This Count is brought under the provisions of Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Individual Defendants.  This cause of action does not sound in fraud. Plaintiffs do not allege that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.  This claim is based solely on negligence and/or strict liability. Plaintiffs expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

228.     The Individual Defendants were each control persons of Playtika by virtue of their positions as directors and/or senior officers of Playtika.  The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of Playtika.

229.     Each of the Individual Defendants participated in the preparation and dissemination of the Registration Statement, and otherwise participated in the process necessary to conduct the IPO.  Because of their positions of control and authority as senior officers and/or directors, each of the Individual Defendants were able to, and did, control the contents of the Registration Statement, which contained materially untrue information and/or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

230.    The Individual Defendants were culpable participants in the violations of Section 11 of the Securities Act alleged in the first cause of action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

231.    As control persons of Playtika, each of the Individual Defendants are liable jointly and severally with and to the same extent as Playtika for its violation of Section 11 of the Securities Act.

## VII.    PRAYER FOR RELIEF

232.    WHEREFORE, Plaintiffs respectfully pray for relief and judgment against the Defendants as follows:

(a)    Determining that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Labaton Sucharow LLP as Lead Counsel pursuant to Rule 23(g);

(b)    Determining and declaring that Defendants violated the Securities Act by reason of the acts, omissions and, status of control alleged herein;

(c)    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial, together with interest thereon;

(d)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by Plaintiffs' consulting and testifying expert witnesses; and

(e)    Granting such other and further relief as the Court deems just and proper.

## VIII.    JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

DATED: May 6, 2022

*/s/   Carol C. Villegas*
**LABATON SUCHAROW LLP**
Carol C. Villegas
David J. Schwartz (*Notice of Appearance forthcoming*)
Jake Bissell-Linsk
David Saldamando
140 Broadway
New York, New York 10005
Phone: (212) 907-0700
cvillegas@labaton.com
dschwartz@labaton.com
jbissell-linsk@labaton.com
dsaldamando@labaton.com

*Counsel for Lead Plaintiff LBMotion Ltd.*
*and additional named Plaintiff Aric Rav Tilman*
*and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall
Rina Restaino
1880 Century Park East, Suite 404
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com
rina@schallfirm.com

*Additional Counsel for Lead Plaintiff*