UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

| | |
|---|---|
| IN RE PLAYTIKA HOLDING CORP. SECURITIES LITIGATION | **MEMORANDUM AND ORDER** <br> 21-CV-6571 (RPK)(SJB) |

---------------------------------------------------------------x
RACHEL P. KOVNER, United States District Judge:

    Plaintiff brought this putative class action against Playtika Holding Corp., its current officers and directors, and its underwriters, alleging violations of Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77*o*. The claims arise out of defendants' alleged failure to disclose an overhaul of two of Playtika's most popular games, which was underway at the time of the company's initial public offering ("IPO"). Defendants moved to dismiss this lawsuit under Federal Rule of Civil Procedure 12(b)(6). *See* Defs.' Mem. in Supp. of Mot. to Dismiss (Dkt. #61) ("Defs.' Mem."). For the reasons discussed below, defendants' motion is granted.

### BACKGROUND

    The following facts are drawn from the amended complaint and documents incorporated by reference therein and are assumed true for the purposes of this order.

**I.   Playtika and Its IPO**

    Playtika is a technology company that develops free-to-play mobile games. Am. Compl. ¶ 1 (Dkt. #43). Its portfolio of games consists largely of "social casino" or "social casual" games, such as slots, bingo, and poker. *Ibid*. Several are the number one grossing games in their respective genres. *Id.* ¶ 184(e); Decl. of Marc. J. Schneider, Ex. A, Form S-1 Registration Statement 104 (Dkt. #61-2) ("Form S-1"). Of those games, *Slotomania* and *Bingo Blitz* were the

most successful, making up around half of Playtika's revenue in 2018, 2019, and most of 2020. Am. Compl. ¶ 115.

Playtika generates more than 97% of its revenue by enticing players to make in-game purchases of virtual items such as chips, tokens, coins, and other digital items. *Id*. ¶¶ 2, 49, 73. Of Playtika's over 11 million daily active users, only around 2.5% make in-game purchases. *Id*.¶ 85. In order to keep revenue flowing, Playtika has to consistently create new in-game features to keep this group of users engaged. *Id*. ¶ 7.

On December 18, 2020, in connection with an anticipated IPO, Playtika filed a Form S-1 Registration Statement with the SEC. *Id*. ¶ 54. It amended the form on January 7, 2021. *Ibid*. On January 14, 2021, the SEC declared the Form S-1 effective. *Ibid*. The following day, Playtika launched its IPO, and the company's stock began trading on the NASDAQ under the ticker symbol "PLTK." *Id*. ¶ 56.

As part of its Registration Statement, Playtika described the "Key Factors Affecting [Its] Business." Form S-1 at 75–76. Playtika stated that it generated substantially all its revenue from the group of players who purchase in-game virtual items, and that the "players' willingness to consistently make in-app purchases is impacted by [Playtika's] ability to deliver engaging content and personalized user experiences." *Ibid.*; Am. Compl. ¶ 101(a). In explaining its business model, under the "Feature Development" section, Playtika noted its expertise in "creating features and player experiences that optimize player engagement, resulting in increased conversion and monetization." Form S-1 at 104; Am. Compl. ¶ 95. Playtika further stated that it was "focused on continuing to implement and enhance features that keep games fresh and increase user engagement." *Ibid*. Thus, it explained, "[t]hroughout the lifecycle of [its] games, [the company] dedicate[s] substantial operational resources and team members to support a constant cadence of

2

novel content and feature creation that drives conversion and continued monetization." Form S-1 at 104; Am. Compl. ¶ 97(a).

Playtika emphasized the same point in a portion of the Registration Statement entitled "How We Are Different." Form S-1 at 97. It stated that Playtika "take[s] a fundamentally different approach to operating games" by focusing on the games' longevity and providing "a constant flow of new content that is highly personalized to users based on their gameplay behavior." *Ibid*.; Am. Compl. ¶ 94.

Playtika also described various "Risk Factors" in the Registration Statement, including "Risks Related to [Its] Business." Form S-1 at 14. Playtika explained that the market for its games "is characterized by rapid technological development" and "disruption by . . . evolving . . . industry standards. As a result, [its] industry is constantly changing games and business models in order to adopt and optimize new technologies." *Id*. at 18. Playtika also stated that "*Slotomania* and *Bingo Blitz* [] collectively generated more than half of [the company's] revenue" in 2018 and 2019. *Id*. at 15. It acknowledged that for those and other games to remain popular, Playtika "must constantly enhance . . . and upgrade the game[s] with new features . . . and content that players find attractive. As a result, each of [its] games requires significant product development, marketing and other resources to develop, launch and sustain popularity through regular upgrades." *Ibid*.

Playtika also described its "Risks Related to [Its] Information Technology and Data Security." *Id*. at 38. Playtika explained that "[its] ability to anticipate or respond to changing technology and evolving industry standards and to develop and introduce improvements and enhancements to games on a timely basis is a significant factor affecting [its] ability to remain competitive." *Ibid*. Playtika warned investors that the measures it would need to take to "adapt to, and keep pace with, changes in technology" "can be costly and generate risk." *Ibid*. It also

3

stated that "[it] cannot assure [investors] that [it] will achieve the necessary technological advances or have the financial or other resources needed to introduce new games or improvements and enhancements to games on a timely basis or at all." *Ibid*. In addition, Playtika stated that "[its] failure to develop or adjust to changes in technology, platforms, devices and operating models and evolving industry standards could adversely impact [its] business." *Ibid*.

In the same section, Playtika warned investors that (i) "from time to time," Playtika would engage in "systems integration or migration work" that could result in "interruptions, delays or cessations of service," *id*. at 41; (ii) it "could encounter difficulties in developing new systems, maintaining and upgrading current systems," *id*. at 40; and (iii) it "may not be successful in implementing new systems and transitioning data, which could cause business disruptions," *id*. at 41.

## II.  Playtika's Post-IPO Performance

On November 3, 2021, Playtika released its financial results for the Third Quarter of 2021. Am. Compl. ¶ 193. Playtika disclosed that its actual revenue for that quarter was $636 million, down from $659.2 million from the prior quarter. *Id*. ¶ 128. It also revised its full-year guidance downwards. *Ibid*. Craig Abrahams, Playtika's CFO, confirmed in an earnings call that "actual Q3 results were down 3.6% sequentially." *Id*. ¶¶ 27, 195.

Abrahams explained that the lower revenue was due in part to "lower-than-expected revenues" for two Playtika games, *Board Kings* and *World Series of Poker*. Decl. of Marc J. Schneider, Ex. E, Q3 2021 Earnings Call Tr. 2 (Dkt. #61-6) ("Earnings Call Tr."). He also attributed the Third Quarter results to "comparatively fewer new promotions and features as a result of some of the infrastructure enhancements we're making." *Ibid*; Am. Compl. ¶ 129. Specifically, Abrahams stated that "product and platform investment that will help our growth in the future resulted in comparatively fewer new product features for *Slotomania* and *Bingo Blitz*."

4

Earnings Call Tr. 2; Am. Compl. ¶ 130.  As to *Slotomania*, Abrahams explained that Playtika had rewritten the "client from the ground up, moving *Slotomania* from C Sharp to Javascript.  This was the culmination of an 18-month project that will allow us to develop features more quickly and efficiently and also give us access to a wider pool of R&D talent."  Earnings Call Tr. 2; Am. Compl ¶ 132.  As to *Bingo Blitz*, Abrahams disclosed that the game was undergoing a "total revamping" and "complete brand face lift, including refreshing the lobby, map, logo, payment page and many other aspects of the game."  Earnings Call Tr. 2; Am. Compl ¶ 155.

After these announcements, on the same day, Playtika's share price dropped by more than 23%.  Am. Compl. ¶¶ 16, 205.

### III. The Infrastructure Changes to *Slotomania* and *Bingo Blitz*

Through speaking with confidential informants and at least one software expert, plaintiff alleges it discovered that at or around the time of the IPO, Playtika had already begun implementing the infrastructure changes to *Slotomania* and *Bingo Blitz* that Abrahams referenced in his earnings call.  *Id*. ¶ 127.  These infrastructure changes, plaintiff contends, "would have a material impact on [Playtika's] ability to rollout features and content," *id*. ¶ 139, and therefore should have been, but were not, disclosed to prospective shareholders in the Registration Statement.

*Slotomania*.  Plaintiff alleges that at the time of the IPO, Playtika was "already undertaking a demanding '18-month project' of migrating *Slotomania*'s programming language from C-Sharp to Javascript."  Am. Compl. ¶ 12.  Plaintiff's confidential informants—former employees of Playtika, *id*. ¶ 45—stated that the migration would "take a long time," be "very complicated," and "pose major risks."  *Id*. ¶ 140; *see id*. ¶¶ 141–43.  More specifically, plaintiff asserts that Playtika would have to expend its limited time and resources on the migration project, which "placed at risk the ability to generate and deploy product features in the same way and frequency as prior to

5

the migration project." *Id.* ¶ 150(f). In addition, according to plaintiff, because Playtika's engineers would need time to familiarize themselves with creating new features and content in the new programming language, the rollout of content would slow. *Id.* ¶ 151. Finally, plaintiff alleges the migration process poses inherent risks, such as the risk that the new product would not properly integrate with third-party platforms. *Id.* ¶ 152.

*Bingo Blitz.* Plaintiff alleges that at the time of the IPO, Playtika was "already in the 'design stage' of executing a 'total revamping' and complete overhaul of *Bingo Blitz*'s User Interface and corresponding 'backend' *Bingo Blitz* engine." *Id.* ¶ 12. One confidential informant explained that there was a "plan" at Playtika for the *Bingo Blitz* redesign to cause "the feature deployment roadmap to decrease between '5% and 10%.'" *Id.* ¶ 169. As with the *Slotomania* migration, plaintiff alleges that the *Bingo Blitz* redesign jeopardized Playtika's ability to timely develop and release new game features for several reasons. First, employees who otherwise would be working on developing new content would instead be spending time overhauling the *Bingo Blitz* interface. *Id.* ¶ 174. Second, the overhaul would require testing before a rollout, which could result in delays in content release. *Id.* ¶ 175. Finally, major overhauls tend to cause users to leave games. *Id.* ¶ 176.

Plaintiff alleges that the risks described above materialized in the Third Quarter of 2021. *Id.* ¶¶ 153, 177.

**IV.   This Lawsuit**

Idan Bar-Asher filed the original complaint in this case in November 2021. Compl. (Dkt. #1). In March 2022, Judge Bulsara appointed LBMotion Ltd. as the lead plaintiff. *See* March 9, 2022 Order (Dkt. #32).

On May 6, 2022, LBMotion Ltd. filed an amended complaint bringing two causes of action against defendants. *See* Am. Compl. First, plaintiff alleges that all defendants violated Section 11

6

of the Securities Act, 15 U.S.C. § 77k, because the Registration Statement was misleading, contained untrue statements of material facts, omitted material facts necessary to make the statements not misleading, and omitted material facts required to be stated therein. *Id*. ¶¶ 214–25. Second, plaintiff alleges that the individual defendants violated Section 15 of the Securities Act, 15 U.S.C. § 77*o*, because they were each "control persons" of Playtika and participated in the preparation and dissemination of the Registration Statement. Am. Compl. ¶¶ 226–31. Plaintiff seeks compensatory damages and costs on behalf of itself and the other putative class members. *See id*. at 76 ("Prayer for Relief").

In alleging violations of Sections 11 and 15, plaintiff proceeds on a culpable-omissions theory. Plaintiff alleges that defendants' failure to disclose the specific infrastructure changes to *Slotomania* and *Bingo Blitz* rendered twenty different statements in the Registration Statement materially misleading. *Id*. ¶¶ 179, 184(a)–(t). Plaintiff does not allege that any one of these statements standing alone is false or misleading. Rather, plaintiff alleges that these statements, "when viewed collectively and in context, created the misleading impression that there were no undisclosed material risks to Playtika's ability to continue rolling out product features on a 'constant cadence.'" *Id*. ¶ 185. Plaintiff specifically references the repeated use of phrases such as "constant cadence" or "constant flow," alleging that they carry "a meaning that there will be a steady undisturbed frequency to the roll-out of product features will occur." *Id*. ¶ 185(d).

Plaintiff also alleges that under Item 105 (formerly Item 503) of SEC Regulation S-K, 17 C.F.R. § 229.105, defendants had a duty to disclose the two infrastructure changes as "material factors that make an investment in the registrant or offering speculative or risky." Am. Compl. ¶ 187. Plaintiff further alleges that defendants were required by Item 105 to disclose "the underlying conditions requiring or prompting Playtika to undergo these two infrastructure

7

changes," including that its code was outdated and that its user base was too old. *Id*. ¶ 188. Lastly, plaintiff alleges the risks that Playtika did disclose were misleading because those risks were "inaccurately described as potential risks." *Id*. ¶ 189; *see id*. ¶¶ 190–92.

Plaintiff seeks compensatory damages and costs on behalf of itself and the other putative class members. *See id*. at 76 ("Prayer for Relief").

Defendants have now moved to dismiss the complaint. *See* Defs.' Mem.

## LEGAL STANDARDS

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor." *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). To avoid dismissal, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The complaint, in other words, must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. While the plausibility standard "is not akin to a 'probability requirement,'" it requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

At the motion-to-dismiss stage, a court may consider only (i) the complaint itself, (ii) documents either attached to the complaint or incorporated in it by reference, (iii) documents the plaintiff relied on and knew of when bringing suit, and (iv) matters in the public record that are subject to judicial notice. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *Leonard F. v. Israel Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999).

**DISCUSSION**

Plaintiff's Section 11 claim is dismissed. Because plaintiff cannot plead a Section 15 claim without a primary offense, that claim is dismissed as well.

### I. Plaintiff Fails to State a Section 11 Claim

Plaintiff has not adequately pleaded a claim under Section 11 of the Securities Act. Section 11 imposes liability for filing a registration statement that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)). To state a claim under Section 11, plaintiff must plead facts sufficient to establish one of the three bases for liability—(1) a material misrepresentation; (2) a material omission of information that is necessary to prevent existing disclosures from being misleading; or (3) a material omission in contravention of an affirmative legal disclosure obligation. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011).

Here, while plaintiff asserts that the Registration Statement contained "untrue statements of material fact," Am. Compl. ¶ 217, plaintiff has not developed a theory of affirmative material misrepresentation. Instead, plaintiff's theory is that defendants violated Section 11 through an omission—namely, through the Registration Statement's failure to disclose that infrastructure upgrades to *Slotomania* and *Bingo Blitz* were underway. *See id.* ¶¶ 184–92. As explained below, plaintiff has failed to state a claim under this theory, because plaintiff has not plausibly alleged that disclosure of that fact was necessary to prevent Playtika's existing disclosures from being misleading or to comply with an affirmative legal obligation.

### A. Plaintiff Has Not Adequately Alleged a Material Omission of Information Needed to Prevent Existing Disclosures From Being Misleading

Plaintiff has not adequately pleaded that disclosure of the infrastructure upgrades to *Slotomania* and *Bingo Blitz* was necessary to prevent existing disclosures from being misleading.

"[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). Rather, Section 11 imposes liability only under limited circumstances, including when a registration statement "omit[s] to state a material fact . . . necessary to make the statements therein not misleading." *Morgan Stanley*, 592 F.3d at 358 (citing 15 U.S.C. § 77k(a)).

Plaintiff argues that disclosure of the infrastructure upgrades to *Slotomania* and *Bingo Blitz* was necessary to prevent portions of the Registration Statement discussing a "constant cadence" of feature releases from being misleading. Specifically, plaintiff alleges that based on statements about "a constant cadence of novel content and feature creation," "a constant flow of new content," a "focus[] on continuing to implement and enhance features that keep games fresh," "a steady release of new features," and "consistently introduc[ing] updates and enhances," Am. Compl. ¶ 184, a reasonable investor would have concluded that "no material undisclosed risks to Playtika's ability to maintain this 'constant cadence'" existed, Pl.'s Opp'n 7 (Dkt. #62). Since the infrastructure upgrades to *Slotomania* and *Bingo Blitz* "in fact pose[d] a risk to the cadence of feature release," *id*. at 19, plaintiff argues, Playtika was obligated to disclose that risk.

Plaintiff's theory fails to state a plausible claim because Playtika expressly disclosed that whether it could maintain a constant cadence of feature deployment was uncertain, because of causes including but not limited to "systems integration or migration work" and potential failures "in implementing new systems and transitioning data." Form S-1 at 41. No Section 11 liability lies where a registration statement "adequately warned the reasonable investor of the allegedly

10

omitted risks." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013); *see DeMaria v. Andersen*, 153 F. Supp. 2d 300, 311 (S.D.N.Y. 2001) ("[C]ourts in this Circuit consistently have dismissed claims under Section 11 if they charge omission of what was in fact disclosed." (quotation marks and citation omitted)), *aff'd*, 318 F.3d 170 (2d Cir. 2003). And "where there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (citing *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730–31 (2d Cir.1998)).

      Here, Playtika disclosed that Playtika's "ability to anticipate or respond to changing technology and evolving standards and to develop and introduce improvements and enhancements to games on a timely basis is a significant factor affecting [its] ability to remain competitive." Form S-1 at 38. Playtika then expressly warned that "[it] cannot assure [investors] that [it] will achieve the necessary technological advances or have the financial or other resources needed to introduce new games or improvements and enhancements to games *on a timely basis or at all*." *Ibid*. (emphasis added). Playtika specifically identified "implementing new systems and transitioning data," "difficulties in developing new systems," and "maintaining and upgrading current systems," as potential causes of disruption. *Id*. at 40–41. These disclosures, taken together, plainly conveyed that there were risks to Playtika's constant deployment of new features, including risks associated with developing, upgrading, and transitioning systems. True, these disclosures were not at a such a fine level of granularity as to mention *Slotomania* or *Bingo Blitz* specifically. But because Playtika's disclosure was "broad enough to cover" the risk associated with those specific upgrades, "the disclosure is not misleading simply because it fails to discuss the specific risk." *Bank of Am. AIG Disclosure*, 980 F. Supp. 2d at 579.

11

Plaintiff contends that Playtika needed to disclose the fact that the *Slotomania* and *Bingo Blitz* infrastructure projects were already underway to prevent the impression that infrastructure changes that might lead to disruption were merely "hypothetical," as opposed to ongoing. Pl. Opp'n 14. But the Registration Statement made clear that changes that could lead to disruption were "constantly" occurring. *See* Form S-1 at 18. Specifically, Playtika disclosed that "[its] industry is constantly changing games and business models in order to adopt and optimize new technologies." *Ibid*. It further stated that its "success depends upon [the company's] ability to adapt to, and keep pace with, changes in technology, platforms and devices, and evolving industry standards . . . this includes continuing to improve [its] technology . . . and adapt to the release of new devices and platforms . . . which can be costly and generate risk." *Id*. at 38. And, in describing how to keep games such as *Slotomania* and *Bingo Blitz* popular with players, Playtika stated that it "must constantly enhance and upgrade [a] game with new features." *Id*. at 15. Since Playtika disclosed that it was constantly engaged in the type of upgrade that could lead to disruptions and interruptions, there was nothing misleading about Playtika's not disclosing the specific projects that it had underway.

Finally, plaintiff falls short in arguing that these disclosures of "potential risks" were misleading because they concerned risks that had already materialized. *See* Am. Compl. ¶ 189–92. "Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." *In re Facebook, Inc. IPO Sec. & Derivative Litig.,* 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013). But plaintiff has not sufficiently pleaded that the risks associated with infrastructure overhauls to *Slotomania* and *Bingo Blitz* had already materialized when Playtika made the challenged statements.

Citing confidential witnesses and a software expert, plaintiff asserts in general terms that certain risks inhere in these types of infrastructure projects. As to *Slotomania*, plaintiff alleges that the migration was "very complex," Am. Compl. ¶ 141, and posed risks of (i) diverting Playtika's finite time and resources to the endeavor, *id.* ¶ 150; (ii) delaying rollouts because Playtika's developers needed to "learn or orient to this new language," *id.* ¶ 151; and (iii) failing to properly integrate with third-party platforms and account for fixes and features from the previous software, *id.* ¶ 152. But, except for summarily asserting that *Slotomania*'s reduced feature deployment "was naturally a consequence" of the migration project, nowhere does plaintiff explain whether or how these hypothetical risks had actually materialized at the time of the IPO. *Id.* ¶ 153.

Similarly, plaintiff alleges in the abstract that the *Bingo Blitz* redesign placed at risk Playtika's ability to consistently release new features because (i) Playtika must devote its limited resources to the redesign, *id.* ¶ 174; (ii) the overhaul would require certain pre-rollout tests, which might result in delays, *id.* ¶ 175; and (iii) major overhauls tend to cause users to leave games, *id.* ¶ 176. Yet again, plaintiff does not allege that any of these risks actually came to pass at the time of the IPO. While plaintiff's confidential witness explained that Playtika had a "plan" for the *Bingo Blitz* redesign to cause "the feature deployment roadmap to decrease between '5% and 10%,'" *id.* ¶ 169, the amended complaint does not allege that this plan existed at the time of the IPO; that the plan had been implemented at the time of the IPO; or that the plan was a result of the materialization of the above-mentioned risks. In any case, such a "generic allegation[]" by a confidential witness, without other factual support, "fail[s] to raise a plausible inference that the Registration Statement omitted a fact, much less a material fact, that required disclosure." *In re Coty Inc. Sec. Litig.*, No. 14-CV-919 (RJS), 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016)

13

(finding confidential informant's allegations that sales were "forecasted to be down," and "smaller than expected" at the time of the IPO were insufficient to sustain a Section 11 claim).

In sum, because Playtika "warn[ed] investors of exactly the risk that plaintiff[] claim[s] was not disclosed," *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 3 (2d Cir. 1996), plaintiff fails to state a claim on the theory that disclosure of the *Slotomania* and *Bingo Blitz* upgrades was needed to prevent existing disclosures from being misleading.

### B. Playtika Did Not Have a Legal Obligation to Disclose the Infrastructure Projects

Plaintiff has also failed to plausibly allege that Playtika had a legal duty to disclose the infrastructure changes to *Slotomania* and *Bingo Blitz*. "[A] duty [to disclose] may arise when there is . . . 'a statute or regulation requiring disclosure.'" *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)). As relevant here, Item 105 of SEC Regulation S-K requires that a registration statement include "a discussion of the most significant factors that make the offering speculative or risky." *Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18-CV-9848 (PGG), 2020 WL 5757628, at *10 (S.D.N.Y. Sept. 27, 2020); *see* 17 C.F.R. § 229.105; *see also Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 598 (S.D.N.Y. 2022), *aff'd sub nom. Tseng v. De Vries*, 2023 WL 8073087 (2d Cir. Nov. 21, 2023).

Playtika was not required to disclose the two infrastructure changes under Item 105 of SEC Regulation S-K. As described above, Playtika disclosed that (i) the measures it takes to "adapt to, and keep pace with, changes in technology" "can be costly and generate risk," Form S-1 at 38; (ii) it might not be able "to introduce new games or improvements and enhancements to games on a timely basis or at all," *ibid*; (iii) it would engage in "systems integration or migration work" that could result in "interruptions, delays or cessations of service," *id*. at 41; (iv) it "could encounter difficulties in developing new systems, maintaining and upgrading current systems," *id*. at 40; and (v) it "may not be successful in implementing new systems and transitioning data, which could

14

cause business disruptions," *id.* at 41.  *See* pp. 10–14, *supra*.  Those disclosures put shareholders on notice that Playtika would engage in systems migration and upgrades that could disrupt the flow of new content—in other words, infrastructure changes like the ones the company implemented for *Slotomania* and *Bingo Blitz*.  Item 105 did not require defendants to disclose those risks at a more granular level because, as explained above, these disclosures were "broad enough to cover [those] specific risk[s]." *In re Bank of Am. AIG Disclosure*, 980 F. Supp. 2d at 579.

Further, Playtika was not required under Item 105 to disclose "the underlying conditions requiring or prompting Playtika to undergo these two infrastructure changes," including that its code was outdated and that its user base was too old, Am. Compl. ¶ 188.  In detailing its business risks, Playtika disclosed that its industry "is characterized by rapid technological development" and "is constantly changing games and business models in order to adopt and optimize new technologies." Form S-1 at 18.  Playtika also disclosed that in order to attract and retain players for its most popular games, Playtika "must constantly enhance . . . and upgrade [its games] with new features . . . and content that players find attractive.  As a result, each of [its] games requires significant product development, marketing and other resources to develop, launch and sustain popularity through regular upgrades." *Ibid*.  Those disclosures informed investors that Playtika needed to constantly develop and upgrade its games both in order to prevent them from becoming outdated and to attract new and retain existing players.

Plaintiff therefore has not stated a Section 11 claim based on the theory that Playtika had a duty under Item 105 to disclose the specific infrastructure changes.

## II. Plaintiff Fails to State a Section 15 Claim

Plaintiff's Section 15 claims must also be dismissed.  Section 15 imposes joint and several vicarious liability for violations of Section 11 on any person who "controls" the primary violator.  *See* 15 U.S.C. § 77o.  "The fate of the plaintiffs' Section 15 claim is wholly dependent on [the]

15

disposition of their § 11 . . . claim[]." *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd*., 620 F.3d 137, 140, n.3 (2d Cir. 2010).  Because plaintiff fails to adequately plead a Section 11 violation, its Section 15 claim is also dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted and plaintiff's claims are dismissed with prejudice.  Plaintiff has neither indicated any intention to seek leave to amend its complaint a second time nor illustrated that it possesses additional facts that may cure its pleading deficiencies.  Accordingly, dismissal without leave to amend is appropriate.  *See Shields v. Citytrust Bancorp, Inc*., 25 F.3d 1124, 1132 (2d Cir. 1994).

The Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

                                                  */s/ Rachel Kovner*
                                                  RACHEL P. KOVNER
                                                  United States District Judge

Dated:   March 18, 2024
           Brooklyn, New York